Tri-County Grain Terminal Company, an Illinois Corporation, Plaintiff-Counterdefendant-Appellee, v. Swift & Company, an Illinois Corporation, Defendant-Counterplaintiff-Appellant.

Gen. No. 11,069.

Fourth District.

December 30, 1969.

Rehearing denied January 26, 1970.

Thomas, Mulliken & Mamer, of Champaign (Albert F. Manion, Roger E. Haughey, Carl J. Sinder, of Champaign, and Harvey L. Hensel, of Chicago, of counsel), for appellant.

Thomson, Thomson & Mirza, of Bloomington, for appellee.

CRAVEN, P. J., delivered the opinion of the court.

Swift & Company appeals from a judgment of $26,920 in favor of Tri-County Grain Terminal Company on a claim for the value of soybeans delivered under a contract between the parties, and from a second judgment entered in favor of Tri-County Grain Terminal Company on an order setting aside a jury verdict of $53,240 for Swift & Company on its counterclaim against Tri-County Grain Terminal Company for damages for soybeans not delivered by Tri-County.

Tri-County Grain Terminal Company, operating a grain-elevator company, had a fleet of six grain trucks used to transport grain in connection with its terminal storage facilities and for hauling to and from local elevators. It had contracted with Swift & Company to deliver certain truckloads of soybeans containing an approximated number of bushels, within a fixed period of

time, to Swift's soybean mill at Champaign where the latter manufactured soybean oil and meal.

The soybeans were received by Swift & Company and measured in accordance with the usual custom and practice in the grain industry existing throughout central Illinois. Incoming grain trucks were driven onto a scale platform and weighed to obtain a gross weight. The truck was then moved off the scales and the soybean contents of the truck dumped into a pit from which they were carried by conveyor belt into large storage tanks and commingled with other incoming grain. After dumping the beans the truck returned to the scale and was reweighed empty to get an empty or "tare" weight. The parties accepted the net weight, i. e., the difference between "gross" and "tare," as accurately representing the quantity of soybeans delivered, as is the established custom and practice.

To deliver the soybeans to the Swift & Company mill Tri-County used two oversized tractor-trailer trucks identified as Units 1 and 4. Each unit consisted of a General Motors Diesel tractor coupled with a 38-foot dump trailer equipped with a hydraulic hoist. The trailer was attached to the tractor by means of a large steel plate called the "5th wheel." The trailer was equipped with landing legs and small forward wheels, called "dollies," by which it was supported when detached from the tractor. When coupled together as a tractor-trailer unit, the unit was 54 feet long. Because of the length of each of these units it could not be weighed on the Swift & Company 45-foot scale platform.

To measure the quantity of soybeans delivered in a truckload the driver positioned his trailer on Swift's scale, lowered its "dollie" wheels, and uncoupled the tractor at the 5th wheel. The tractor then was driven off the scale platform and the trailer weighed separately. Hose and other flexible connections between the tractor

and trailer were left in place. After weighing the trailer the tractor was backed up on the platform and reattached to the trailer at the 5th wheel. The truck was then taken to the dump area, the forward end of the trailer elevated, and the contents cargo dumped into the large pits. Since the Tri-County units were too large to be accommodated there, its trailers were dumped by use of their own internal hydraulic hoists.

After the soybeans were unloaded, the trailer body was lowered and the truck driven to the scale platform where the trailer again was detached from the tractor, the tractor driven from the scale platform, and the trailer re-weighed.

The determination of the number of bushels of soybeans delivered was made by weight by subtracting the empty weight or "tare" of the trailer from its loaded weight or gross. The difference was the weight of the soybeans delivered.

In the foregoing manner Swift received from Tri-County 248 truckloads of soybeans between the dates in question—April, 1965, and December 29, 1966. It settled and paid Tri-County for 242 of these truckloads at the agreed contract price per bushel, but refused to pay for the remaining truckloads.

Swift & Company introduced evidence showing that Tri-County had ordered these two tractor-trailer units to be built specially by Converto Manufacturing Company with a 1,000-gallon liquid storage tank installed in the nose of each trailer, measuring $5' \times 4\frac{1}{2}' \times 7'$. A second tank fitted on the back of the tractor had a small sleeper compartment built on its top. The tanks and fittings on Unit 4 were shown to have increased the basic cost of the unit from $9,000 to more than $19,000. The trailer tank was formed by a bulkhead and top with a separate partition and with a short tarpaulin covering the storage tank under the large tarpaulin which covered the entire trailer bed.

The evidence shows that from April, 1965, to March, 1966, Tri-County made all of its deliveries to Swift in Unit 1 and in both Units 1 and 4 from March, 1966. The storage tanks were removable but the evidence shows that they were left in place in the nose of the trailer interconnected with the storage tanks on the back of the tractors without removal.

During the times the units were so used they were frequently repaired for leaks by the manufacturer and by Freuhaul Trailer Company at Peoria. The cost of some of these repairs and payment of such items by Tri-County was shown in evidence.

Swift's bean grader, who was the only Swift employee to inspect either trailer, on occasions removed the large tarpaulin from the trailer bed, but he did not become aware of the short tarpaulin covering the trailer storage tanks nor the tanks themselves. He testified that he did observe the partition in the nose of Unit 1 trailer. Upon inquiry he was informed by the Tri-County Unit 1 driver that the partition had been installed to prevent loading the truck all the way to the front so as not to be "too heavy" at the nose of the hydraulic cylinder to lift and to dump. On one occasion when the bean grader mentioned a leak in the connecting hose between the trailer and tractor, the driver told him he was carrying "liquid fertilizer." On another occasion the bean grader "heard air hissing" from the bottom of the sleeper cab during an unloading operation and observed liquid bubbles formed along the seam and felt escaping air.

The evidence shows that fluids contained within the storage tank in the nose of the trailer could be transferred to and retained within the storage tank mounted on the tractor by operating a switch on the dashboard of the tractor. The dashboard switch opened and closed an electric valve which was mounted beneath the tractor storage tank and which controlled the flow of liquids from one tank to the other. Fluids contained in the

trailer's storage tank could be transferred into the tractor's storage tank by opening the gate valve while the trailer body was being hoisted to the dumping position within the period of time required to dump the cargo of soybeans. The fluids could then be retained within the tractor storage tank by closing the gate valve before the trailer body was lowered into highway position.

The evidence shows that Tri-County did not advise Swift of the storage tanks mounted on its trucks nor the manner in which the tanks were interconnected so as to permit the transfer of fluids from trailer to tractor during the dumping operation. There appeared to be nothing about the appearance of either unit that would have suggested to an observer that the trucks were equipped to haul liquids nor to reveal the manner in which a fluid cargo might be transferred from the trailer to the tractor and back again.

The average tare weight of Unit 1 trailer approximated 11,900 pounds. Mr. Bracy, testifying for Tri-County, fixed the average "tare" of Unit 4 trailer at 13,000 pounds. The tare weights of the trailers would normally vary within 100 pounds of the average "tare" after the soybean cargo had been unloaded. The evidence shows, however, that on occasion the tare weight of the Tri-County trailers unexplainedly varied from their average empty weights. On November 23, 1966, the tare weight of Unit 4 was recorded as 14,060 pounds. On December 5, 1966, the tare weight of Tri-County Unit 1 was recorded as 13,400 pounds, and on a second trip 13,480 pounds.

On December 29, 1966, Illinois State Police officers followed one of these units and advised Swift managers they suspected liquid storage tanks were concealed in the trucks. Prior to that time no one associated with Swift had any knowledge that the trucks were equipped to haul fluids which might be transferred to the tractor while the soybeans were being dumped. At the request

of the State Police Swift continued to receive truckloads of soybeans from Tri-County which were segregated into an empty storage tank and reweighed in a railroad boxcar previously weighed empty.

Between December 30, 1966, and January 9, 1967, at the request of the State Police, Swift received 11 additional truckloads of soybeans, segregated them in an empty storage tank, and reweighed them on its truck scale. In each such instance the beans were substantially short weight. These 11 truckloads, the two received on December 29, 1966, and the four additional previously received and unpaid for, constituted the 17 truckloads of soybeans for which Swift refused to pay.

On January 9, 1967, a Tri-County driver was arrested by the State Police and Unit 1 seized after making its delivery to Swift. The State Police inspected the liquid storage tanks, finding therein a small amount of blue-green fluid. The soybean load delivered by the truck was found to be 4,460 pounds short weight.

Nine truckloads received by Swift between December 30, 1966, and January 9, 1967, were substantially short of net weight.

After Unit 1 was seized by the State Police it was examined by Professor Cletus Bowman of the University of Illinois, who testified that he found that the truck was so equipped that fluids could be transferred from the trailer tank to the tractor tank, without hoisting the trailer body, by means of a pump mounted on the back of the tractor; also that fluids could be retransferred from the tractor to the trailer by releasing a quick-disconnect fitting at the trailer and inserting a short length of hose equipped with a similar fitting between a port on the pump and the trailer connection. Pictures of these fittings were introduced into evidence.

Swift offered to prove that similar deliveries by Tri-County to Ralston-Purina plants in Bloomington and Peoria, to A. E. Staley Company in Decatur, and to the Ta-

319

bor Grain Company at Havana, during the same general periods, showed weight differentials in tare or empty weight of the trailer; and that there were large leakages of liquids from the connecting hoses between tractor and trailer. These offers of proof were refused. Swift contends error in such refusal.

Plaintiff's president admitted that he had caused the tanks to be built on the trucks but contended that they were for the purpose of transporting antifreeze. He also stated that they were ordered to transport liquid fertilizer to market and in connection with a hog operation, but admitted that they were never so used and that the hog operation never came into existence. He denied that the tanks ever had been used for any purpose on any occasion other than transporting antifreeze. After the arrest of its driver on January 9, 1967, Tri-County returned its tractors to the lessor and the trailers to Converto Manufacturing Company. Tri-County ceased to do business in 1967.

Tri-County here sued Swift to recover payment for the 17 truckloads of soybeans allegedly delivered and not paid for in the amount of $31,142.26. Swift admitted it had not paid for the 17 truckloads of soybeans but denied that it received the number of bushels which plaintiff claimed were delivered in these loads. Swift also claimed it paid for 21,780 bushels of soybeans not actually delivered and asked that its excess payment therefor be setoff against any amount owing to plaintiff, and also counterclaimed for wilful and fraudulent misrepresentation of the quantity of soybeans delivered in the 259 truckloads allegedly causing actual damage of $95,000. Swift also prayed for exemplary damages of $200,000.

The jury returned separate verdicts on the complaint and the counterclaim, finding the value of the 17 truckloads unpaid for to be $26,920 and returning a verdict for plaintiff on its complaint in that amount. The jury

also found in favor of Swift & Company on the counter-claim and assessed its actual damages at $53,240.

The trial court ruled that the issue of exemplary dam-ages was not properly raised by the pleadings and re-fused to give Swift's tendered instructions on exem-plary damages. Swift now asserts that the trial court erred in refusing to submit the issue of exemplary dam-ages to the jury and in refusing the tendered instruc-tions on such matter. Upon oral argument, however, Swift waives this error in the event this court should or-der a net judgment for it on the other issues.

The trial court entered judgment in favor of Tri-County in the amount of $26,920. It set aside the jury verdict for Swift & Company on the counterclaim. Swift appeals.

Swift & Company contends that only one verdict and one judgment should have been returned and entered where both the claim and counterclaim arose from the same series of transactions and where the litigation would resolve all rights of the parties. It further con-tends that fraud is seldom susceptible of proof by direct evidence and that the jury verdict for it on the coun-terclaim should not have been set aside when the evi-dence here is viewed in its aspect most favorable to the plaintiff. Hence, it argues that one judgment should have been entered—and that a net judgment favorable to defendant-counterclaimant, Swift & Company. We agree.

■ ■ The verdict of the jury in favor of Swift & Company on its counterclaim should not have been set aside. A judgment notwithstanding a jury verdict ought to be entered only in those cases in which all of the evidence when viewed in its aspect most favorable to the opponent so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. The evidence here shows misrepresented quantities of soybeans were charged for by Tri-County. Fraud seldom

can be shown by direct evidence. We cannot conceive of any more persuasive case of fraud than was circumstantially proved in this case. The shifting of fluid to cause a false weight of grain—conceived, concealed and performed so ingeniously as the evidence here shows was carried out by Tri-County—overwhelmingly constituted ample proof of fraud and money damages to Swift & Company. The jury verdict on the counterclaim should not have been set aside. We view the evidence as indeed overwhelming.

 Whenever the fact of injury or damages has been proved with reasonable certainty, some uncertainty as to the amount of damages sustained is not sufficient ground to set aside a jury verdict awarding damages. A party cannot be permitted to escape liability for his wrongful acts simply because the plaintiff's damages are difficult to prove. The "best evidence" which the nature of the subject will permit in such cases is sufficient to sustain a jury award. Johnston v. City of Galva, 316 Ill 598, 147 NE 453, 38 ALR 1384 (1925). This is clearly the correct rule where the verdict of the jury is not clearly excessive. Novitsky v. Boland, 322 Ill App 698, 54 NE2d 619 (1st Dist 1944); Avrams v. Fuller, 325 Ill App 694, 60 NE2d 644 (1st Dist 1945). Tri-County can hardly be heard to complain of any reasonable rule on damages when damages are made difficult to ascertain by its misconduct.

The more certain is the rule where a wrongdoer's acts appear to be deliberate or wilful. 22 Am Jur2d, Damages, §§ 22–23; Story Parchment Co. v. Paterson Parchment Paper Co., 282 US 555 (1931); Bigelow v. RKO Radio Pictures, 327 US 251, 66 S Ct 574 (1946). The ingeniousness and the cleverness of concealment here practiced cry out for the application of the rule. The jury verdict was not contrary to the fair weight of the evidence and its reasonable inferences. The trial court committed

322

reversible error in allowing the motion for judgment notwithstanding the verdict.

When a claim and a counterclaim—part of a single controversy between the same parties—are tried in the same action, only one judgment is proper. Where the counterclaim is less than the plaintiff's demand the plaintiff should have judgment for the difference. If it exceeds the claim established by the plaintiff the defendant should have a judgment for the difference. 20 Am Jur2d, Counterclaim, Recoupment, and Setoff, § 157, at 364; 80 CJS, Setoff and Counterclaim, § 61c; Corcoran v. Lehigh & Franklin Coal Co., 138 Ill 390, 28 NE 759 (1891); Apex Motor Fuel Co. v. Stiglitz, 348 Ill App 123, 108 NE2d 29 (1st Dist 1952); Lipton v. Pennsylvania Rubber Co., 1 Ill App2d 223, 116 NE2d 923 (1st Dist 1953). There is no necessity to pass upon the other grounds of error asserted.

The trial court should not have set aside the verdict in favor of Swift & Company on the counterclaim but should have entered a net judgment in favor of defendant, Swift & Company, for the difference between the jury verdict of $53,240 in its favor on the counterclaim and the verdict of $26,920 against it and in favor of the plaintiff on the original complaint. The judgment of the circuit court of Champaign County is reversed and this cause is remanded to that court with directions to enter a net judgment in accordance with the views herein expressed.

Reversed and remanded with directions.

SMITH and TRAPP, JJ., concur.