**BUDGET RENT–A–CAR OF MISSOURI, INC., Respondent,**

v.

**B & G RENT–A–CAR, INC., B & G Leasing, Inc., William J. George and James R. George, Appellants.**

**No. WD 30662.**

Missouri Court of Appeals, Western District.

June 30, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 4, 1981.

Application to Transfer Denied Sept. 8, 1981.

John B. Ewing, Jr., Kansas City, for appellants.

Duke W. Ponick, Jr., Kansas City, for respondent; Morris & Foust, Kansas City, of counsel.

Before WASSERSTROM, C. J., DIXON, PRITCHARD, SOMERVILLE, TURNAGE and CLARK, JJ., and SWOFFORD, Senior Judge.

PRITCHARD, Judge.

On January 3, 1974, respondent as "Licensor" made an exclusive franchise with "Sublicensee", Budget Rent-A-Car, of Kansas City, Kansas, to rent automobiles in that city. The sublicensee later changed its corporate name to B & G Rent-A-Car, Inc. B & G Leasing, Inc., with appellants George as its directors and officers, was beneficially interested in B & G Rent-A-Car, Inc. Sublicensee operated under the agreement for about three years in Kansas City, Kansas, and Kansas City, Missouri.

Paragraph 10.05 of the agreement provided: "SUBLICENSEE shall not during the term of this Agreement and for a period of one hundred eighty (180) days after its termination engage in any other vehicle rental business from a location within the licensed territory * * *. SUBLICENSEE further acknowledges the impossibility of accurately determining the tangible and intangible damages which LICENSOR will suffer if SUBLICENSEE fails or refuses to adhere to this provision and accordingly agrees to entry without prior notice, to the extent that applicable notice requirements may be waived, of temporary and permanent injunctions against SUBLICENSEE'S breach of this provision and SUBLICENSEE further agrees to pay to LICENSOR an amount equal to the aggregate of LICENSOR'S costs of obtaining any such temporary and permanent injunctive relief, in-

cluding all costs of investigation and proof of facts, court costs and attorneys' fees."

On December 3, 1976, appellant James R. George notified respondent that the sublicensee agreement was to be terminated as of March 4, 1977, this being within the 90 days notice provision of paragraph 10.02 of the agreement. Sometime before December, appellants George contacted Dollar-A-Day Rent-A-Car Systems and paid $8,750 for a franchise license therefrom on October 13, 1976. The Georges assigned that franchise license to their newly created (December, 1976) company, Nexus Rent-A-Car Corporation, which was formed in anticipation of terminating the relationship with respondent. Dollar-A-Day was competing with respondent. Nexus then began doing business with Dollar-A-Day at the same location that B & G Rent-A-Car had transacted business as sublicensee with respondent. Respondent learned of this and filed a petition for injunction and damages against appellants which resulted in a temporary injunction against appellants and the persons, firms or corporations they owned or controlled, from engaging in the rental car business in Kansas City, Missouri, and Kansas City, Kansas. That injunction did not stop appellants, because there was formed a company called Westmoreland Industries, Inc., which received an assignment of appellants' rights to their franchise agreement with Dollar-A-Day, except those portions of the Kansas City, Missouri, areas in Clay and Platte counties. Westmoreland had as its front one Joseph L. Stuckey, who had worked as its handyman, but who had no familiarity with or knowledge about the car rental business, nor specifically, what rental volume was generated at each rental location; how many cars Westmoreland held for rentals; and in what banks that company kept its funds. Stuckey was the one the Georges contacted for the assignments of their rights in Dollar-A-Day to Westmoreland, and the payment for those rights came in the form of two $1,000 checks paid from B & G Leasing's bank account, the checks being signed by its accountant and controller.

Following the assignment to Westmoreland, Dollar-A-Day car rentals were made at B & G Rent-A-Car locations and another was opened near the Holiday Inn in Kansas City, Platte County, Missouri. Prior to the termination of the sublicensee agreement, appellant B & G had operated for over three years from addresses which were advertised as Budget Rent-A-Car locations, which locations and telephone numbers were listed as Budget Rent-A-Car in the telephone book. Appellant continued to use these numbers even after the issuance of the temporary injunction, and wrote numerous rental contracts from the locations. The exhibits show that during the approximate 180 day period that the temporary injunction was in force (until it was dissolved by the trial court on September 1, 1977), appellants made 1,003 car rentals in violation of the injunction and the noncompetition covenant in the sublicense agreement, having a gross dollar amount of $80,692.91. The trial court entered judgment of actual damages of $8,000 (about 10% of the gross dollar amount); $11,000 in attorney fees; and punitive damages of $16,000, a total of $35,000.

Respondent's petition was for an injunction and damages. The pleading for injunction was based upon a violation of paragraph 10.05, supra, of the agreement. Without reference to any other paragraph of the agreement, respondent also prayed for its "actual damages by reason of defendants' conduct, including, but not limited to, court costs and attorneys' fees. (5) For such punitive damages against defendants B & G Rent-A-Car, Inc. and B & G Leasing, Inc. as are just and proper in the circumstances." After the expiration of the 180 days of the noncompetition covenant, the trial court dissolved the temporary injunction which it had entered. Thereafter, on November 20, 1978, without objection, the cause came on for determination of damages, and evidence was heard thereon. Appellants contend, and argue, that respondent's petition was based on paragraph 10.05, supra, and that it was limited in damages thereunder to its costs of obtaining the temporary injunction, including costs of in-

vestigation and proof of facts, court costs and attorneys' fees. Appellants say that respondent did not seek relief for actual and exemplary damages under paragraph 10.06 of the agreement, which is "In addition to all of the remedies granted to LICENSOR by this Agreement, LICENSOR shall have the right to bring suit against SUBLICENSEE, its partners, shareholders and directors, as applicable for actual damages sustained by LICENSOR and caused by the breach by any one or more of them of any provision of this Agreement or the Operating Manual and for exemplary damages, and such injunctive and other equitable relief as may be appropriate." In Illinois, a court may retain jurisdiction after an issue of injunctive relief is disposed, to entertain the issue of damages as it may arise from a breach of an underlying duty. See the abstract opinion, *Weisbrodt v. Norris*, 332 Ill.App. 279, 75 N.E.2d 50[2] (1947); and *Dinoffria v. International Brotherhood etc.*, 331 Ill.App. 129, 72 N.E.2d 635, 641[6, 7] (1947), cert. denied 335 U.S. 815, 69 S.Ct. 33, 93 L.Ed. 370 (1948). Missouri law is the same. See *Clark-Lami, Inc. v. Cord*, 440 S.W.2d 737 (Mo.1969); *Downing v. Dinwiddie*, 132 Mo. 92, 33 S.W. 470 (1895); and *Martin v. Swenson*, 335 F.Supp. 765 (D.C. Mo.1971), construing Missouri law. The trial court dissolved the temporary injunction upon the ground that there could be, after the 180 day period, no danger of immediate and irreparable harm to respondent. This case does not fall within *Melbourne Corp. v. City of Chicago*, 76 Ill.App.3d 595, 31 Ill. Dec. 914, 394 N.E.2d 1291, 1303[25, 26] (1979), where it was held that damages are not recoverable for the violation of an injunction, the remedy being to seek a citation for contempt. Appellants had adequate notice of respondent's claim for actual and exemplary damages by the service of the petition, and no separate action therefor was required.

The dispositive issue is whether respondent has adequately proved its damages for breach of the noncompetition covenant. The law of Illinois is that the measure of damages for that violation is the loss of profits and the diminution of the value (in-

jury to) of the plaintiff's business. *Schatz v. Abbott Laboratories, Inc.*, 51 Ill.2d 143, 281 N.E.2d 323, 325 (1972). But the rule in *Schatz*, at the same page, is qualified by a quote from *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 115 N.E. 389, 390 (1917), " 'It is perhaps true that absolute certainty as to the amount of loss or damages in such cases is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages.' "

Illinois, apparently, previous to the *Schatz* case, supra, had followed the rule that the recovery of loss of profits, absent a contract provision contemplating such damages, is not permitted. *Flug v. Craft Mfg. Co.*, 3 Ill.App.2d 56, 120 N.E.2d 666, 671 (1954). In Illinois, however, the strict rule of requiring certainty in the proof of damages in cases involving covenants not to compete has been relaxed in *Vendo Company v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1 (1974) cert. denied 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1975). There, Vendo was a former competitor of a business operated by Stoner. Stoner sold out to Vendo in return for cash payments, stock and a managerial position with Vendo, the contract for which contained pre and post termination restrictions on competition. In violation of the noncompetition agreement. Stoner thereafter became involved in another company's venture competing with Vendo. The judgment of the trial court, reinstated by the Illinois Supreme Court, was Vendo's loss of profits for some 7 years, and the diminution of the value of its business. Stoner's challenge to the award was that the damages, which represented the difference between what would have been earned by Vendo had it had the (competing) machine which Stoner marketed and that

which was earned without it, was [similarly to what appellants here contend] too speculative and uncertain. In expansion of the basic rule that recovery of anticipated profits was not permitted in Illinois, the *Vendo* court said, 321 N.E.2d 1, 13[10], "In our consideration of this facet of the appeal we are mindful of two limiting factors. The first is that the loss of profits, whether past or future, claimed to arise out of exclusion from a market is customarily not susceptible of detailed or direct proof, and that unless proof of an inferential character is permitted, the result would be to immunize a defendant from the consequences of his wrongful acts. That principle has been frequently enunciated by the Supreme Court of the United States in the context of actions to recover damages resulting from violations of the Federal antitrust laws. (See *Bigelow v. RKO Pictures, Inc.* (1946), 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652, 660; *Zenith Radio Corp. v. Hazeltine Research, Inc.* (1969), 395 U.S. 100, 123–124, 89 S.Ct. 1562, 23 L.Ed.2d 129, 148–149.) The principle is equally applicable where the claim of lost profits arises from a violation of fiduciary obligations or breach of contract. See *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill.2d 143, 147–149, 281 N.E.2d 323."

Following the *Vendo* case, see *Society of Mt. Carmel v. Fox*, 90 Ill.App.3d 537, 543, 46 Ill.Dec. 40, 45, 413 N.E.2d 480, 485[11] (1980), where it was said, "The assessment of damages by a trial court sitting without a jury will not be set aside unless manifestly erroneous; and may be upheld if it falls within the range of estimates given by expert witnesses."

The evolution away from the demand for proof of certainty in damages in actions of this nature in Illinois has had a similar history in Missouri. Hence, the law of both states appears to be the same or similar. Anticipated profits were generally not recoverable. *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo.1968), but note the further quote, " 'They [anticipated profits] may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their

amount; and, when this is made to appear, they may be recoverable.' " See also *Tnemec Company v. North Kansas City Development Co.*, 290 S.W.2d 169, 174[4–6] (Mo. 1956), where it was noted that although the courts of this state have been strict in evaluating the sufficiency of the evidence warranting a recovery of damages for loss of profits, "[T]he law is also well settled that damages may be recovered for loss of profits due to the breach of a contract if the evidence is sufficiently certain and definite to warrant the jury in estimating their extent." In *Hargis v. Sample*, 306 S.W.2d 564 (Mo.1957), a case involving a claim of damages by way of loss of profits in hotel room rentals occasioned because of defendants' failure to repair them, thus making them untenantable, the court said the evidence was sufficient to support the amount of the verdict, but reversed and remanded because of an erroneous instruction on certain claimed items of damages. The court commented, at page 569[4–7], "It has been said, however, that the amount of estimated loss of earnings (and the same would apply to loss of prospective profits) should, in the event of uncertainty, at least be supported by the best evidence available. (Citing case.)" *Mills v. Murray*, 472 S.W.2d 6 (Mo. App.1971), was a suit for injunction and damages for breach of a three year posttermination noncompetition clause of a contract. Defendants had organized a competing firm and solicited plaintiffs' clients. The court found that certain clients of plaintiffs were lost and 10% of the value of those contracts would have been the lost profits thereon. Defendants argued that the damages were too speculative because it was not shown how many of plaintiffs' clients would have remained with them but for defendants' wrongdoing. At page 16[17], the court said, "But if that be so, it is only because of defendants' wrong that the damages cannot be determined with more certainty and defendants will not be heard to say, on that account, the plaintiffs may not have full relief for the injury defendants inflicted on them." And, at page 17, the court said further, "We believe it

may fairly be said that whatever uncertainty inhered in the proof of damages for the breach of such a covenant was within the contemplation of the parties at the time it was executed."

In *Garrett v. American Family Mutual Insurance Co.*, 520 S.W.2d 102 (Mo.App. 1974), wherein Kansas law was applied, plaintiff, a general agent, under an agency agreement, was given exclusive rights as to renewals of policies originally written by him, which the trial court found was a property right akin to a noncompetition clause. When defendant converted to a system of captive or exclusive agents plaintiff elected to remain independent. Defendant then assigned his active policies to another agent, informed policyholders that he was no longer with the company, and unleashed several other agents to solicit in his previously assigned territory. Plaintiff sought as damages the total amount of lost commissions based on the number of policies written by defendant which were active at the time of termination minus those he had retained. Plaintiff applied a lapse ratio percentage and a percentage for increment in premiums, and claimed the gross loss of commission as his loss of net profits, found to be proper by this court. Defendant argued that proof of damages was speculative. The court rejected that argument and directed an award based on the average commission for all the policy renewals lost by plaintiff, saying at page 118[21–23], "Where computation of damages is made uncertain by the nature of the breach of contract, '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed.2d 652 (1946); *Novo Industrial Corp. v. Nissen*, 30 Wis.2d 123, 140 N.W.2d 280, 285[10, 11] (1966); 22 Am.Jur.2d, § 23, p. 42. The covert manner of the breach considered, Garrett proved all damage capable of proof and he will not be denied compensation because the nature of the wrongdoing prevented a more fastidious demonstration of loss." [Note the similarity of this quote with that of the *Vendo* case, supra.]

Other cases following the Illinois and Missouri trends are:

*Burckhardt v. Burckhardt*, 42 Ohio 474 (1885); *Wood v. Pender-Doxey Grocery Co.*, 151 Va. 706, 144 S.E. 635 (1928), in which an intentional wrong was involved, the holding being that in such cases the degree of proof is much relaxed in favor of the injured party. See also Corbin on Contracts, § 1021 (1964); Williston, A Treatise on the Law of Contracts, § 1345 (3rd Ed. 1968); and McCormick on Damages, § 27, pp. 101–102, where it is said, "There are various modifications to the rule of certainty. They enable the courts, while holding up a high standard of certainty as an ideal, to avoid harsh applications of it. Among them are: (a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference. (b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty. (c) Mere difficulty in ascertaining the amount of damage is not fatal. (d) Mathematical precision in fixing the exact amount is not required. (e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient. (f) The plaintiff may recover the value of his contract, and this may be measured by the value of the expected profits. (g) Profits may sometimes be proved as evidence of damages, when they would not be directly recoverable." Note also the Uniform Commercial Code (adopted in Illinois), § 1–106(1), and Comment 1; and § 2–715, Comment 4, indicating a relaxation of the rule of certainty in sales transactions.

■ These observations may be made from the facts in this case: Appellants' devious concealment of their activities through assignments of rental rights to subsequent sham companies is clearly shown. Their breach of the noncompetition agreement by leasing 1,003 cars during the 180 days made those rentals unavailable to respondent for rental. The parties expressly agreed in the sublicense agreement that there was impossibility of accurately deter-

**838**

mining the tangible and intangible damages for its breach. The sublicense agreement provides for a method of computing respondent compensation during continuation thereof, i. e., 10% of the gross revenue of appellants (Para. 5.02), and this was acknowledged by appellants' counsel during trial to be a measure of damage: "MR. MAUER: * * * The contract itself shows any measure of possible damages. Even if they would connect up these contracts of Westmoreland Industries with the defendants in this lawsuit, the contract spells out the benefit is to be ten percent of the gross, Your Honor." Additionally, respondent's chief managing officer, with about 15 years experience in the car rental field, testified that respondent would have made a minimum of 10% on the gross volume of the (1,003 rentals) transacted by appellants. In arriving at that percentage, he took into account all the appropriate expense factors and deductions—insurance, employees, high care expense, everything. Had the sublicense agreement not been terminated, respondent would have been entitled to 10% of the gross revenues for the 1,003 rentals. The fact of the breach and damage therefrom is definitely shown.

■ By related Points I and II appellants claim that respondent cannot invoke the aid of equity for relief because it did not allege and prove performance on its part. A portion is directed toward the issuance of the temporary injunction, but that injunction was dissolved and is moot. As to performance as it might relate to recovery of damages, respondent's Mr. Steinberg testified without objection to various acts done to assist appellants, as provided by the sublicense agreement, which testimony was sufficient to justify the court in finding against the contention, and the pleadings may be treated as amended to meet the same.

■ Respondent proved its expenses for attorney fees, as allowable under the sublicense agreement. The evidence shows appellants' breach to have been wilful and without just cause or excuse, and the same

was sought to be concealed. The award of punitive damages is supportable.

The judgment is affirmed.

SOMERVILLE and CLARK, JJ., and SWOFFORD, Senior Judge, concur in majority opinion.

WASSERSTROM, C. J., and DIXON and TURNAGE, JJ., dissent and concur in separate dissenting opinion by TURNAGE, J.

TURNAGE, Judge, dissenting.

I cannot agree that the evidence in this case supported either the award of actual damages for loss of profits or the award for attorney fees.

The majority discusses a number of legal theories on which the damage award might be sustained but does not make any application of the facts to those theories except for the conclusion that "the fact of the breach and damage therefrom is definitely shown."

I agree that actual damages in this case are properly assessable for a violation of the agreement contained in ¶ 10.05, by which B & G agreed not to engage in the car rental business for a period of 180 days after the termination of the agreement. The assessment of damages for a violation of this agreement is provided in ¶ 10.06 and not in ¶ 10.05. The damages in ¶ 10.05 are limited to "an amount equal to the aggregate of licensee's [Budget] costs of obtaining any such temporary and permanent injunctive relief, including all costs of investigation and proof of facts, court costs and attorney fees." The only other remedy specified in ¶ 10.05 is by way of injunction. The provision for injunction followed the agreement that there is an impossibility of accurately determining tangible or intangible damages which Budget suffered if B & G violated the non-compete agreement "and [B & G] accordingly agrees to entry without prior notice, to the extent that applicable notice requirements may be waived of temporary and permanent injunctions against SUBLICENSEE'S [B & G] breach of this provision . . . ."

Paragraph 10.05 provided that a breach of the agreement not. to compete would

constitute unfair competition. The majority correctly states that the measure of damages for a violation of the non-compete agreement of ¶ 10.05 is the loss of profits and the diminution in the value of Budget's business. This rule is set out in *Vendo Company v. Stoner* (*Stoner 1*), 58 Ill.2d 289, 245 N.E.2d 263, 277–8[14] (1969):

"In addition to the recovery of the salary paid Stoner during the breach, Vendo would be entitled to recover any damages to its business occasioned thereby. This would be the measure of lost profits to Vendo during the period of the breach, plus the diminution of its business at the end of the period covered by the covenants."

The difficulty in this case is occasioned by the failure of Budget to identify the measure of damages, or, what damages it was seeking to recover following the termination of the temporary injunction. Budget actually was seeking to recover damages for the breach of the injunction and not for unfair competition. This is shown by the examination of Harold Steinberg, the managing officer of Budget and the only witness who testified concerning damages. The following will illustrate the theory of Budget's claim for damages:

"Q. To get right to the point here, Mr. Steinberg, you were present when the court entered its order in this case for the temporary injunction.

"A. Yes.

"Q. Thereafter, did you call and advise me of certain circumstances relating to whether that order was being observed or not?

"A. Yes, I did.

"Q. Would you just relate very briefly what those circumstances were?

"A. After we got the injunction, we, I checked periodically, calling myself the various offices and found that there was no change between the operation before the injunction or after the injunction; and, at that time, I called your office very strongly trying to find out what happened and why the injunction wasn't being enforced.

"Q. Okay. Just tell the Court what observations you made about the circumstances of whether or not the injunction was being observed and what steps did you thereafter take.

"A. Well, there was no changes between the time before and after,

\*     \*     \*     \*     \*     \*

"Q. Okay. Based on your observations, including the fact that Jimmy George was continuing to be in the office at the airport location, your phone calls, did you instruct the law firm that I worked for at that time to continue its efforts in enforcing your rights under the agreement that was a subject of the injunction?

"A. Yes, sir; I sure did.

"Q. You, at that time, were concerned with obtaining and getting enforcement of the relief that had already been granted?

"A. That's correct.

"Q. Did we discuss with you that there were essentially two things we could do during the dependency of the injunction: namely, get a citation for contempt or to have the injunction made permanent?

"A. Yes.

"Q. Did you authorize me to investigate and do legal work towards those ends?

"A. I did."

Pursuing the theory that it was seeking damages for a violation of the injunction, Budget then inquired of Steinberg if he had examined a group exhibit of approximately 1,000 contracts showing cars rented by B & G during the time the injunction was in force which coincided with the 180-day period following the termination of the agreement. Steinberg testified that he could have netted close to 30% from the rental of those 1,000 cars with a minimum of 10%. The 10% was less all expenses. That was the sum total of the evidence regarding loss of profits suffered by Budget.

I agree that the so-called rule of certainty proving damages for loss of profits was relaxed years ago. However, I do not agree that the law has eliminated the requirement of any proof upon which a finding of loss of profits may be based. The majority quotes from *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 287, 115 N.E. 389, 390 (1917): " 'All the law requires in cases of this character is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages.' "

The rule regarding the sufficiency of the proof of loss of damages was stated in *Tri-County Grain Terminal Co. v. Swift & Company*, 118 Ill.App.2d 313, 254 N.E.2d 311, 315[3, 4] (1969):

"Whenever the fact of injury or damages has been proved with reasonable certainty, some uncertainty as to the amount of damages sustained is not sufficient ground to set aside a jury verdict awarding damages. A party cannot be permitted to escape liability for his wrongful acts simply because the plaintiff's damages are difficult to prove. The 'best evidence' which the nature of the subject will permit in such cases is sufficient to sustain a jury award."

Thus, the Illinois cases have characterized the proof of loss of profits as evidence which shall "with a fair degree of probability tend to establish a basis" and "the best evidence which the nature of the subject will permit." In this case Budget did nothing more than show that B & G rented 1,000 cars during the time it was prohibited from competing. There was no effort to show the source of these rentals, i. e., whether by telephone or walk-in business, nor was there any effort to show that Budget's business decreased during this time. While Budget did not have to show with a high degree of certainty that it would have rented the 1,000 cars if B & G had adhered to its obligation, nonetheless it is common knowledge there are many rental car businesses. To simply say that B & G rented 1,000 cars and Budget would have made 10% of the gross had it rented those cars does not begin to satisfy the proof required by Illinois courts to show a loss of profits to Budget. This evidence does not show a fair degree of probability that Budget would have rented all or any part of these cars. Neither does it show this was the best evidence which the nature of the subject would permit. Possible forms of proof which readily come to mind would be a comparison with the volume of business done by Budget during the time involved as compared with a comparable period. Another would be the possibility of expert testimony concerning the operation of the rent-a-car business and the effect on Budget of B & G violating its agreement. That might well present evidence which would permit the drawing of reasonable inferences as to what would have happened to the business had B & G actually withdrawn from the market.

In addition, many possibilities are raised by the sparse record but left undeveloped. For instance, the testimony that Jimmy George was continuing to be in the office at the airport leaves unanswered the question of what name was displayed at that office. It would be one thing if the office were continued under the name of Budget; it would be another if the name used were Dollar-A-Day or some other car rental name. There is no indication of what information is available on the 1,000 car rental forms, i. e., whether they were rented as result of a telephone call or the location at which the rental was made. It would seem that the form would at the very least indicate the location at which the rental was made. In that case if the rental were made at the airport with an office identified as being Budget, it would be relatively simple to infer that such rental would have been made by Budget if it had not been made by B & G, but if the office were identified as a Dollar-A-Day office, it would be difficult, to say the least, to infer that Budget would have made that rental. Further evidence would be available as to what action, if any, Budget took to intercept calls placed to a Budget number but actually under the control of B & G. In short, there are numerous questions which arise and which would have

a significant bearing on the question of how many of the 1,000 rentals Budget would have made if B & G had not remained in business, but unfortunately such questions are all unanswered because of the failure of Budget to identify and properly develop its measure of damages.

The difficulty previously mentioned involved in the failure of Budget to recognize that it was seeking damages for the violation of the agreement not to compete rather than damages for a violation of the injunction accounts for the failure of Budget to properly prove its loss of profits and diminution in the value of its business. Having failed to develop its correct theory of recovery for damages, Budget did not intentionally prove its damages, nor did it accidentally do so. In an effort to sustain this judgment despite Budget's failings, the majority is forced to develop a number of theories, but no amount of theoretical gymnastics on the part of this court can substitute for the proper proof which Budget failed to present in the trial court.

The majority next seems to sustain the damage for loss of profits on the wrongful conduct of B & G. I agree the evidence fully supports a finding of this wrongful conduct, but I cannot agree that this alters the measure of damages or the proof which should be required of Budget in this case. The cases cited by the majority, including *Garrett v. American Family Mutual Insurance Co.*, 520 S.W.2d 102 (Mo.App.1975) discussing this theory are pitched on the ground that the wrongful conduct has made it more difficult or even impossible for the complaining party to prove its loss of profits. In this case there is no attempt to show that the wrongful conduct interfered in the slightest with the ability of Budget to prove its losses. In fact, no such showing could be made because the wrongful conduct was directed solely at trying to prevent Budget from learning that those in control of B & G were the actual owners of the entity which was actually renting cars in violation of the agreement with Budget. The proof of loss of profits and the diminution in Budget's business was just as available without the wrongful conduct as it was

with it. Thus, these cases have no application in trying to sustain the loss of profits damages in this case. This again is a theory developed by this court. It was not urged in the trial court or here by Budget.

The majority also seeks to sustain the loss of profits on the provisions of ¶ 10.05 that there was an impossibility of accurately determining the tangible and intangible damages. However, ¶ 10.05 makes it clear that this impossibility resulted only in the ability of Budget to obtain an injunction. Nowhere does this refer to any proof of loss of profits. In fact, following the statement concerning the impossibility of accurately determining damages, ¶ 10.05 provides that B & G agrees to entry without prior notice of a temporary and permanent injunction. Thus, the impossibility of ascertaining damages is strictly limited to forming a foundation for the obtaining of injunctive relief and not as any waiver of the proper proof to support an award of damages for loss of profits.

The majority further states the agreement provided for the method of computing the compensation due Budget during the continuation of the agreement as 10% of the gross revenue received by B & G. The opinion further states that if the agreement had not been terminated Budget would have been entitled to 10% of the 1,000 rentals. This is true, but, of course, the whole point of the lawsuit is that the agreement was terminated and Budget was not entitled to receive 10% after the termination. The agreement limits Budget's damages after termination to those attributable to unfair competition if B & G violated its agreement not to compete. This, of course, is the loss of profits and diminution of value to Budget's business. It is completely immaterial as to what might have been if the agreement had not been terminated. The statement made by Mr. Mauer during his objection is far from clear but certainly cannot alter the measure of damages or the proof required.

I would hold in this case that the evidence is insufficient to support the award

for damages for loss of profits. I believe the proof of damages in this case is as infirm as that found to be insufficient in *Stoner, supra.* There, the court stated that the measure of damages is the provable loss sustained by the party seeking damages and not the gain realized by the other party. *Vendo,* 245 N.E.2d at 278. Here all Budget proved was the gain received by B & G. Under *Vendo* and the cases there cited, such evidence is insufficient to prove Budget's loss of profits.

The majority pays scant attention to the attorney fee question by simply stating that Budget proved their expenses for attorney fees as allowed under the agreement. Paragraph 10.05 is the only provision for the payment of attorney fees and, as set out above, such fees are limited to those expended in the obtaining of an injunction. The only proof concerning the amount of attorney fees came in the redirect examination of Mr. Steinberg in the following:

"Q. Through March 23, 1978 you had incurred three thousand, three hundred eighty-nine dollars and ninety-seven cents of legal fees and expenses; is that correct?

"A. Yes sir.

\*     \*     \*     \*     \*     \*

"Q. And through this past Friday, [November 17, 1978] with that same lawfirm in connection with this case, the total legal fees and expenses incurred was eleven thousand, eighty-nine dollars and ninety-seven cents.

"A. Yes, sir.

"Q. Okay. You've had occasion to examine the time sheets and the expenses and I believe they're in order?

"A. Yes."

The temporary injunction was issued on March 23, 1977, and was dissolved on September 1, 1977. The amount of fees paid *through March 23, 1978, obviously includes* services performed after the temporary injunction had been dissolved. No permanent injunction was requested or issued and the record does not reflect any legal services performed in connection with the injunction after the temporary injunction was dissolved. The fees incurred between March 23, 1978, and November 17, 1978, were unconnected with the obtaining of the injunction. The only evidence bearing on attorney fees shows the bulk of such fees were incurred long after the temporary injunction was dissolved and therefore not connected with the obtaining of an injunction. While the evidence does show some fees were in connection with the obtaining of the temporary injunction, the amount is not segregated so that under the evidence it is impossible to determine what fees were incurred in connection with the injunction. In Illinois "there is no common law or equitable principle that allows attorneys' fees either as costs or as damages" and assessing such fees rests wholly on statutory or contractual authority. *Trustees of Schools of Township 42 North v. Schroeder,* 8 Ill. App.3d 122, 289 N.E.2d 247, 250 (1972).

The trial court in this case did state that it was allowing attorney fees as damages and not as attorney fees. However, such award was clearly improper under *Schroeder.* Since the evidence on attorney fees did not relate to the only purpose for which such fees might be recovered there is no evidence on which to base an award of attorney fees. This is aside from any question of the lack of proof of reasonableness.

The issue of punitive damages must abide the determination of actual damages. *Cirese v. Spitcaufsky,* 265 S.W.2d 753, 760[12] (Mo.App.1954). The entire issue of damages should be retried.

I would reverse and remand this cause for a retrial on the issue of actual damages sustained by Budget for loss of profits and diminution in the value of its business because of the violation of B & G of its covenant not to compete during the 180 days following termination of the agreement. I would reverse the judgment for attorney fees and remand for further proceedings to properly prove the allowable amount. I would reverse the judgment for punitive damages and remand for consideration after the fixing of the other damages.