ENOS GILL, Plaintiff-Appellant, v. JAMES T. FOSTER *et al.*, Defendants-Appellees (Richard McCormick *et al.*, Defendants).

Fourth District No. 4—91—0603

Opinion filed July 23, 1992.—Rehearing denied August 26, 1992.

C. Steve Ferguson, of Heller, Holmes, Hefner & Eberspacher, Ltd., of Mattoon, for appellant.

Nancy E. Martin and Richard J. Wilderson, both of Graham & Graham, of Springfield, for appellee St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis.

Karen L. Kendall, of Heyl, Royster, Voelker & Allen, of Peoria, and Daniel R. Simmons, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee Calixto F. Aquino.

Randall A. Mead, of Drake, Narup & Mead, P.C., of Springfield, for appellee James T. Foster.

JUSTICE McCULLOUGH delivered the opinion of the court:

In the circuit court of Sangamon County, plaintiff Enos Gill sued defendants James T. Foster, M.D., Calixto F. Aquino, M.D., and St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis for medical malpractice. Plaintiff's first-amended complaint added defendants Dr. Richard McCormick, Dr. Raymond L. Farrell, and Gastrointestinal Associates, S.C. On April 24, 1990, a settlement was reached between plaintiff and these additional defendants. The cause was continued for written stipulation and judgment order. On August 15, 1990, the written stipulations were submitted and orders of dismissal were entered as to defendants McCormick, Farrell, and Gastrointestinal Associates, who are not parties to this appeal. As to the remaining parties, summary judgment was granted in favor of St. John's Hospital, and a verdict was directed in favor of Foster at the close of plaintiff's case. In returning a verdict in favor of plaintiff against Aquino, the jury found plaintiff's total damages to be $55,000, but reduced that amount to $27,500 after also finding that 50% of the damages were attributable to plaintiff's negligence. Judgment was entered on the verdict, and plaintiff appeals.

Plaintiff raises the following issues: (1) whether the granting of summary judgment in favor of St. John's Hospital was error because a genuine issue of material fact exists with regard to the performance of the hospital's agents and employees; (2) whether it was error for the trial court to refuse to allow one of plaintiff's experts, a surgeon, to testify concerning the standard of care pertaining to defendant Foster, a radiologist; (3) whether the jury's finding that plaintiff was negligent was against the manifest weight of the evidence; (4) whether the trial court committed an abuse of discretion in refusing to admit plaintiff's exhibit Nos. 1 and 6, being medical bills from Memorial Medical Center and Dr. Rogers, where there was no evidence

as to which items on the bills were necessitated by the alleged medical malpractice of defendant Aquino; (5) whether the trial court committed an abuse of discretion in refusing the plaintiff's offer of proof concerning what the testimony of a hospital administrator would be as to the average cost of a hiatal hernia repair; (6) whether the trial court committed an abuse of discretion in refusing to allow plaintiff's expert to testify as to the residual effects of the decortication of plaintiff's lung pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220); (7) whether the damages assessed by the jury against defendant Aquino were inadequate and proved elements of damages were ignored; and (8) whether the trial court erred in allowing defense counsel to comment on plaintiff's burden of proof during opening argument. We affirm.

Plaintiff entered St. John's Hospital in Springfield under Farrell's care for evaluation and work-up for surgery to correct a chronic condition, reflux esophagitis. On December 19, 1984, McCormick performed the surgery, a Nissen fundoplication. Plaintiff was discharged on December 28, 1984. However, because he was experiencing chest pain, plaintiff proceeded directly to the office of his family physician, Aquino, in Litchfield. Aquino hospitalized plaintiff in St. Francis Hospital in Litchfield, where Foster served as radiologist. During his stay at St. Francis, plaintiff's condition worsened and plaintiff was transferred to Memorial Medical Center on January 5, 1985. Two days later, an operation was performed to return plaintiff's stomach to his abdominal cavity from his chest, to which it had herniated.

The first issue is whether the granting of summary judgment in favor of St. John's Hospital was error because a genuine issue of material fact existed with regard to the performance of the hospital's agents and employees. The trial court granted St. John's Hospital's motion for summary judgment on March 23, 1990. Plaintiff's amended complaint alleged, and the hospital's answer admitted, the following: (1) plaintiff was hospitalized at St. John's Hospital on December 16, 1984; (2) the hospital undertook to provide care to plaintiff during this hospitalization for surgery; (3) plaintiff was operated on at St. John's Hospital on December 19, 1984; and (4) following plaintiff's operation, St. John's Hospital undertook to provide plaintiff with post-surgical nursing care. The hospital denied plaintiff's allegations of the negligence of its agents, servants, and employees and that such alleged negligence was the proximate cause of plaintiff's injuries.

On appeal, plaintiff argues that the granting of summary judgment was error because a genuine issue of material fact existed as to whether nurses employed at St. John's deviated from a reasonable

standard of care by failing to inform plaintiff's physicians that plaintiff was experiencing chest pain at the time of his discharge on December 28, 1984, and by discharging plaintiff while he had such chest pains. McCormick testified in his September 26, 1988, deposition that he first saw plaintiff when he was admitted to St. John's Hospital. McCormick was consulted by Farrell because of plaintiff's reflux esophagitis. "Reflux" refers to the backward flow of material from the stomach, and "esophagitis" refers to inflammation of the esophagus. The Nissen fundoplication is meant to prevent gastroesophageal reflux by rendering once again competent the lower esophageal sphincter mechanism. The surgery was performed December 19. On December 24, plaintiff experienced vomiting. The doctor's progress notes indicated that on December 26, plaintiff complained of chest pain. The doctor also recalled discussing this with plaintiff the next day and plaintiff indicated he thought he pulled a muscle in his chest while vomiting. The nurses' notes noted the complaint of chest pain and that the left lung was congested. The doctor palpated the chest and listened to plaintiff's chest to eliminate an inner-thoracic problem as an etiology of the pain. McCormick said he saw plaintiff again on the date he was discharged and did not feel plaintiff had any congestion. When asked about the nurses' note, McCormick said he disagreed with the conclusion stated therein. McCormick was not asked if he had any criticisms of the nurses at St. John's Hospital with regard to their care of plaintiff.

Plaintiff, in his depositions, described the pain as similar to what he felt when he had viral pneumonia. Plaintiff told McCormick about the pain and asked him about pneumonia being a complication of surgery. The nurses were aware of the pain on December 26. Plaintiff stated McCormick talked to him, but did not examine him on the morning plaintiff was discharged from St. John's Hospital. He did not recall McCormick ever examining him with a stethoscope. When plaintiff was being discharged on December 28, he complained to the nurse of chest pain. The nurse "checked" him and said something was wrong. According to plaintiff, she advised him to go to his family doctor. Plaintiff was discharged from St. John's Hospital at about 10 or 10:30 a.m. The Gills drove straight to Aquino's office. Aquino listened to plaintiff's chest and admitted him to the hospital in Litchfield. McCormick and Farrell had visited plaintiff on the day of his discharge from St. John's Hospital. Plaintiff told them of his problem, and according to plaintiff, McCormick explained it was normal to have pain after surgery.

Plaintiff's wife, Evelyn, was also present when plaintiff was discharged from St. John's Hospital. She, too, recalled that the nurse who removed the staples from the area of plaintiff's surgical incision listened to his chest. According to Mrs. Gill, the nurse told plaintiff to call his doctor when they got home, believing he may want to take an X ray. When she was asked why they did not ask the nurse to see a doctor at St. John's Hospital, Mrs. Gill replied: "Well, I asked her if they couldn't take an x-ray [*sic*] here before we left and she said no, that he was a surgeon, so with that we were taken down to—."

Jerry Durham, R.N., Ph.D., is a faculty member at Illinois Wesleyan University. As plaintiff's expert witness, he was asked to review the case to ascertain whether there was a problem related to the nursing role in the discharge of the plaintiff. Based on his understanding of the case, Durham opined that the failure of the nurse to pursue the plaintiff's complaint at the time of discharge would deviate from the standard of care for nurses. Durham stated plaintiff should have been advised that if he had severe pain, he should seek medical attention. Durham admits that, according to plaintiff, the nurse advised him to see his physician and he did so. Durham noted that the medical records do not disclose the type of procedure employed by the nursing staff discharging the plaintiff, and even assuming the appropriate discharging procedure was not followed, he could not say it made any difference as to the ultimate outcome in this case. Nurses do not order chest X rays, so the failure to do so was not a deviation from the nursing standard of care. Durham stated, "I did not see anything in the record that would indicate that any particular intervention by nurses caused the problem for which he was treated after discharge from St. John's." Nor could Durham opine that any omission by the nurses caused plaintiff's later problems.

Dr. James David Rogers was the surgeon who attended plaintiff at Memorial Medical Center following the referral by Aquino. Rogers stated in his discovery deposition that he had no criticism of St. John's Hospital. The only potential criticism he would have is that the nurse to whom plaintiff stated he was having problems with his chest should have reported it to McCormick. She may have; Rogers did not know. But, if McCormick had seen plaintiff just prior to discharge, plaintiff had reported the problem to McCormick, and McCormick decided to discharge plaintiff, Rogers "certainly would not" have criticism of this nurse. Plaintiff's brief refers to Rogers' evidence deposition wherein Rogers explained the symptoms of herniation of the stomach into the chest and opined that had plaintiff's condition been diagnosed earlier, the procedure to correct this condition would have

been simpler and would have been performed on a healthy, rather than a critically ill, patient. Rogers' testimony in the evidence deposition does not suggest the failure to diagnose resulted from the failure of the nursing staff at St. John's Hospital to perform their activities in a manner commensurate with the appropriate standard of nursing care.

Similarly, plaintiff's expert, Dr. David K. McAfee, described the symptoms that were present on December 24 and 25, 1984, which would lead a well-qualified surgeon to diagnose plaintiff's condition as a herniation of the stomach into the chest, but he does not relate the failure to diagnose to a deficiency in nursing care. Nor does Aquino suggest there was a deficiency in nursing care at St. John's Hospital. Aquino states he could not recollect plaintiff saying he told Farrell or McCormick about the chest pain or that a nurse at the time of his discharge told him to go to his family doctor.

■■ ■ Pursuant to section 2—1005 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005), a party may move for summary judgment and may file supporting affidavits. The opposing party may file counteraffidavits. In addition to the affidavits, the trial court may consider the pleadings, depositions and admissions on file to determine whether any genuine issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. This procedure allows the trial court to determine if a genuine issue of material fact exists, but not to try the issue. While summary judgment facilitates the prompt disposition of lawsuits, it is a drastic remedy allowed only when the moving party's right to it is clear and free from doubt. In determining the propriety of granting summary judgment, the trial court should construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the movant and liberally in favor of the respondent. Although inferences may be drawn from undisputed facts, an issue should be decided by the trier of fact and summary judgment denied where reasonable persons could draw divergent inferences from the undisputed facts. (*Pyne v. Witmer* (1989), 129 Ill. 2d 351, 357-59, 543 N.E.2d 1304, 1307-08.) In reviewing the granting of summary judgment, the role of the reviewing court is to determine if the trial court correctly ruled that no genuine issue of material fact exists, and if none exists, if judgment was correctly entered for the moving party as a matter of law. *O'Hara v. Holy Cross Hospital* (1989), 185 Ill. App. 3d 694, 699, 542 N.E.2d 11, 14, *aff'd* (1990), 137 Ill. 2d 332, 561 N.E.2d 18.

"In a medical malpractice case a plaintiff must present expert testimony to establish the applicable standard of care, that

the defendant deviated from the applicable standard of care, and that the deviation resulted in plaintiff's injury. (*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 297, 529 N.E.2d 552, 556, citing *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872.) Exceptions to the requirement of expert testimony at trial have been found to exist in cases in which treatment by the defendant is so common or the act so grossly negligent that a layman would be able to make a proper evaluation in light of his own experience and knowledge. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256-57, 381 N.E.2d 279, 282." (*Diggs v. Suburban Medical Center* (1989), 191 Ill. App. 3d 828, 833, 548 N.E.2d 373, 377.)

In a case involving a plaintiff's complaint that the care and supervision afforded a decedent by the hospital and its nursing staff was insufficient, this court noted the following rules of law:

"It is well established that a hospital's duty to its patients requires it to conform to the legal standard of reasonable conduct in light of the apparent risk. (*Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392.) While a hospital is not an absolute insurer of a patient's safety, it owes him a duty of protection and must exercise a degree of reasonable care as his known condition requires. (*Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 435 N.E.2d 877.) A plaintiff must prove that a hospital failed to comply with the standard of proper care which guides institutions holding themselves out as devoted to the care and saving of human life, and that this failure resulted in the injury complained of. (*Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 211 N.E.2d 762.) The standard of care a hospital is held to is the accepted standard of care within the medical community. (*Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 718, 399 N.E.2d 198, 205.)" *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 596, 491 N.E.2d 803, 811.

What was the standard of nursing care plaintiff established in this case? No expert testified nurses had the authority to refuse to release from care a patient discharged by his physician. No expert testified that a nurse has an obligation to call—for the purpose of examining a patient prior to discharge—a physician who had not been treating the patient where the nurse disagrees with the conclusion of the treating physician. No expert has testified that a nurse under such circumstances has a duty to send the patient to the nearest emergency room

instead of suggesting that, if he is experiencing pain, he should see his family physician.

The only relevant standard of nursing care established in this case was that the discharging nurse should have noted plaintiff's complaint of chest pain on his medical record and brought it to the attention of the treating physician. Plaintiff said he complained of chest pain to the nurse. The record does not contain an entry regarding such a complaint. However, as Rogers noted in his deposition, the nurse may have brought the complaint to the attention of one of the treating physicians. None of the nurses caring for plaintiff were deposed, nor were the affidavits of any such nurses submitted.

■ St. John's Hospital argues that several physicians, including plaintiff's expert, testified that the nursing staff of St. John's Hospital acted in compliance with the accepted standard of care. However, in light of Durham's testimony with regard to the duty to report potential complaints and the absence of any notation in the medical charts and evidence that the complaint was communicated to the treating physician, a material question of fact would seem to exist regarding whether the duty of care was breached.

As plaintiff notes, in *Cwiertnia v. Zaborowski* (1989), 192 Ill. App. 3d 841, 549 N.E.2d 655, a first-month resident was found to have breached a duty of care by failing to note on the medical chart or to otherwise bring to the attention of his superiors his suspicion concerning a pulmonary embolism of the patient. In *Cwiertnia*, summary judgment for the defendant doctor was reversed.

*Cwiertnia* does not support plaintiff's position and is distinguishable. That case dealt with a doctor's failure to consider a diagnosis and to note the same in the hospital chart. While nurses clearly have a different duty of care to a patient than does a doctor and nurses do not diagnose patients' maladies or practice medicine, according to Durham they, too, have a duty to note and report their observations. This presents a fact issue and is not subject to summary judgment.

The next question is whether the element of proximate causation was established, assuming a duty and breach of duty have been shown. Ordinarily, breach of duty and proximate causation are questions of fact for the jury. When the undisputed facts lead to only one inference, however, summary judgment may be an appropriate disposition. (*Turner v. Roesner* (1990), 193 Ill. App. 3d 482, 488-90, 549 N.E.2d 1287, 1291-92, *appeal denied* (1990), 132 Ill. 2d 555, 555 N.E.2d 386.) There is sufficient evidence of proximate cause to submit the issue to the trier of fact if it can be inferred from the evidence that it is more likely true than not true that defendant's breach of the

duty of care was the proximate cause of plaintiff's injury. See *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424, 328 N.E.2d 301, 305.

It is clear that McCormick was aware of plaintiff's chest pain before plaintiff was discharged from St. John's Hospital. McCormick was aware of the nurses' notations of lung congestion prior to discharging plaintiff. If the nurse who prepared plaintiff for discharge had made another notation, there is no evidence that such a notation would have prevented plaintiff's discharge. It is mere speculation that McCormick might have reconsidered his diagnosis later that same morning because a nurse again related plaintiff's complaint, of which the doctor was aware at the time he made his diagnosis. It is at this juncture that the distinction between *Cwiertnia* and this case manifests itself more clearly.

In *Cwiertnia*, the appellate court stated that had the defendant noted the possibility of pulmonary embolism on the chart or otherwise brought it to the attention of the attending physicians, he would not have contributed to a failure to diagnose, and if the jury did not believe that the attending physicians actually discussed the possibility of pulmonary embolism, the jury might also decide that had defendant brought this possibility to the attention of the attending physicians, the decedent would have received the necessary medical care. (*Cwiertnia*, 192 Ill. App. 3d at 847, 549 N.E.2d at 659.) As already noted, the defendant in *Cwiertnia* was a physician. In this case, the care provided by a nurse is being considered. Defendant does not draw this court's attention to testimony of any deponent which suggests a nurse may make a diagnosis contrary to that of the attending physician or recommend that tests be taken. Nor has anyone stated that a nurse has a duty to become an advocate of the patient to plead his case to a doctor after the doctor has already been made aware of the symptoms. Furthermore, this case is distinguishable from *Cwiertnia* because plaintiff admits in this case that the attending physician knew of the chest pains.

The nurse did not cause nor could she have prevented McCormick's misdiagnosis of the etiology of plaintiff's chest pain. There is absolutely no evidence McCormick would have reexamined plaintiff on the nurse's relating of plaintiff's chest pain given the fact McCormick was already aware of the chest pain and had misdiagnosed it. Furthermore, McCormick had just seen plaintiff on that morning only a few hours before. Nothing indicates that the severity or location of the pain, as related to the nurse, was different from the symptoms described to the doctor.

■ While the plaintiff's frustration and, perhaps, anger concerning the quality of the treatment he received is understandable, the discharge nurse's failure to relate plaintiff's complaint of chest pain to an attending physician was not the cause of plaintiff's injury because the doctor already knew of the pain. Even Durham stated he did not think the result would have been different if the nurse had followed the appropriate procedure. At oral argument, plaintiff suggested Durham is not an adequate expert to establish proximate cause which, according to plaintiff, should be established by a physician. However, plaintiff has disclosed no other evidence which supplies this crucial element. In *Roberts v. Sisters of Saint Francis Health Services, Inc.* (1990), 198 Ill. App. 3d 891, 896-97, 556 N.E.2d 662, 666, a directed verdict in favor of a defendant hospital was upheld. The *Roberts* court noted that, even if it was assumed that a duty of care was established requiring defendant to provide written aftercare instructions to patients, there was no evidence of breach of duty or that the breach proximately caused the injury. With regard to proximate causation, the court specifically noted that there was no evidence that the plaintiff's failure to seek follow-up care was due to an omission of such an instruction on the defendant's aftercare instruction sheet. Here, even if there was a duty, there is no evidence that a breach thereof was a proximate cause of plaintiff's injury. Accordingly, the entry of summary judgment in favor of St. John's Hospital is affirmed.

The second issue is whether it was error for the trial court to refuse to allow one of plaintiff's experts, a surgeon, to testify concerning the standard of care pertaining to defendant Foster, a radiologist. The issue raised concerns the failure of the trial court to consider the testimony of McAfee, a surgeon, with regard to the standard of care of a radiologist. Plaintiff further argues that if McAfee's testimony had been allowed, plaintiff would have established a *prima facie* case against Foster and the directing of the verdict as to him would have been error.

"Certainly, the right to a jury trial is not impaired by the directing of a verdict since a right to a jury verdict exists only when the evidence presents a factual dispute of some substance. The determination of whether the evidence is sufficient is a matter for the jury, as trier of fact, once the trial judge has decided whether there is any evidence which raises a factual dispute. As a result, the standard of review in cases in which, after hearing the evidence, the trial judge removed the case from the consideration of the jury by directing a verdict, or overturned the jury's verdict by entering a judgment *n.o.v.*, is

different than it is when the trier of fact, whether jury or judge, has been allowed to make a decision on the evidence. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the Illinois Supreme Court stated that verdicts are to be directed only in cases when all the evidence, viewed in its aspect most favorable to the opponent to the motion for directed verdict, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand." *Zientara v. Long Creek Township* (1991), 211 Ill. App. 3d 226, 252, 569 N.E.2d 1299, 1313-14.

Foster argues that since plaintiff failed to object to the motion for directed verdict at the time it was made, he has waived the issue for purpose of review. After a review of the record, we do not agree with Foster's conclusion.

"An expert witness is a person whose special knowledge, skill, experience, training, or education is determined by the trial court to qualify said witness to testify to an opinion, based upon the witness's experience, because the opinion will aid the trier of fact in resolving a question which is beyond the understanding or competence of persons of common experience. Whether the person qualifies as an expert is a matter resting in the sound discretion of the trial court. *Craft v. Acord* (1974), 20 Ill. App. 3d 231, 313 N.E.2d 515." *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1051, 532 N.E.2d 1091, 1101, *aff'd in part, rev'd in part on other grounds* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.

■■ ■ Whether a witness is qualified to testify as an expert is a preliminary question to be determined by the judge from a qualifying inquiry, including a *voir dire* by the opposing party. The court, not the jury, makes the determination as to whether the standards for qualification have been met. (*O'Brien v. Meyer* (1989), 196 Ill. App. 3d 457, 461-62, 554 N.E.2d 257, 260.) The burden of establishing the expert's qualification rests with the proponent of the testimony, in this case the plaintiff, and the trial court's determination of whether the witness is qualified to testify as an expert in radiology will be overturned on appeal only if an abuse of discretion can be demonstrated.

"In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court but rather did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so

that substantial injustice resulted." (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.)

Section 8—2501 of the Code (Ill. Rev. Stat. 1989, ch. 110, par. 8—2501) provides the following standards for qualifying expert witnesses in medical malpractice cases:

"In any case in which the standard of care given by a medical profession is at issue, the court shall apply the following standards to determine if a witness qualifies as an expert witness and can testify on the issue of the appropriate standard of care.

(a) Relationship of the medical specialties of the witness to the medical problem or problems and the type of treatment administered in the case;

(b) Whether the witness has devoted a substantial portion of his or her time to the practice of medicine, teaching or University based research in relation to the medical care and type of treatment at issue which gave rise to the medical problem of which the plaintiff complains;

(c) whether the witness is licensed in the same profession as the defendant; and

(d) whether, in the case against a non-specialist, the witness can demonstrate a sufficient familiarity with the standard of care practiced in this State."

In determining whether a licensed physician is qualified as a medical expert in a malpractice action, the trial court considers the proposed witness' educational and employment background to ensure the witness is familiar with the medical issues in the case. The qualification also rests on verifying that the proposed expert's medical opinion is predicated on the prevailing "local" or "national" standard of care. *Smock v. Hale* (1990), 197 Ill. App. 3d 732, 739, 555 N.E.2d 74, 78.

Under the standards outlined above, it is clear that a physician generally cannot testify as to the standard of care of a podiatrist, *i.e.*, unless licensed in the same profession. (See *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 285, 396 N.E.2d 13, 16.) In the case at bar, Foster and McAfee were both physicians, but McAfee was not a radiologist.

McAfee testified he is a general surgeon. He graduated from Northwestern University Medical School in 1953. He was certified by the American Board of Surgery in 1979. He had training in medical school with regard to the interpretation of X rays. In addition, while he was teaching medical students, he instructed radiology as it related to surgery. Throughout his practice, he viewed X-ray photographs on a daily basis. He estimated the number of such X rays to be in the tens of thousands. He testified he was familiar with the national

standard of care of reasonably well-qualified radiologists practicing in that specialty. However, McAfee admitted he is not a radiologist, has never been employed as a radiologist, and is not board certified by the American College of Radiology. Within the field of medicine, radiology is a different area of practice than surgery. In ruling on Foster's objection to McAfee testifying as an expert in radiology, the trial judge stated:

> "Certainly as the x-rays [*sic*] relate to general surgery he has some expertise, but what we're in trial on is a radiologist practicing the profession of the speciality of radiology, and in that light you have not demonstrated that this witness has any more expertise than a normal surgeon, that he has taken any classes other than any medical student would take.
>
> At this time I'm going to deny his qualifications to testify as an expert in interpretation of x-rays [*sic*] by a radiologist."

Plaintiff argues that a physician licensed in all branches of medicine is qualified to testify about the standard of care regardless of the specialty in which the defendant practices. He relies on three cases dealing with the qualifications of a reviewing health professional who must be consulted and find, in a written report, that a plaintiff filing a healing art malpractice action has a reasonable and meritorious cause for filing such action pursuant to section 2—622(a) of the Code (Ill. Rev. Stat. 1989, ch. 110, par. 2—622(a)). The three cases cited by plaintiff are *Moss v. Gibbons* (1989), 180 Ill. App. 3d 632, 536 N.E.2d 125, *Relaford v. Kyaw* (1988), 173 Ill. App. 3d 1034, 527 N.E.2d 1328, and *Hagood v. O'Conner* (1988), 165 Ill. App. 3d 367, 519 N.E.2d 66. In *Moss* (180 Ill. App. 3d at 636-37, 536 N.E.2d at 127-28), this court discussed the statute and the other two cases as follows:

> "Section 2—622(a)(1) places two restrictions on the selection of the reviewing health professional. First, the health professional must be 'knowledgeable in the relevant issues involved in the particular action.' (Ill. Rev. Stat. 1985, ch. 110, par. 2—622(a)(1).) Second, the health professional must practice in the same medical specialty of any defendant specialists. Ill. Rev. Stat. 1985, ch. 110, par. 2—622(a)(1).
>
> The plaintiff selected Sidney D. Kamen, M.D., as the reviewing health professional. Kamen is licensed to practice medicine in all of its branches. He specializes in ophthalmology. As such, Kamen is knowledgeable in the diagnosis and treatment of eye disorders. Thus, the first restriction on the selection of the reviewing health professional is met.

The medical specialty restriction on the selection of the reviewing health professional was recently discussed in *Hagood v. O'Conner* (1988), 165 Ill. App. 3d 367, 519 N.E.2d 66. The appellate court noted Illinois does not define or otherwise regulate the medical specialties of physicians. Rather, a licensed physician is qualified to practice medicine in all of its branches. (Ill. Rev. Stat. 1985, ch. 111, par. 4401 *et seq.*) For these reasons, the appellate court determined:

'[A] licensed physician in Illinois is a legally qualified practitioner in every so-called medical specialty. Therefore, for the purposes of this Act, a physician who is licensed to practice medicine in all of its branches may evaluate the treatment given by any other physician who is licensed to practice medicine in all of its branches, even if the defendant physician holds himself out to be a specialist.' *Hagood*, 165 Ill. App. 3d at 372-73, 519 N.E.2d at 69.

Defendant Gutierrez is alleged to be the agent of St. James Hospital. Gutierrez is a physician specializing in radiology. In *Relaford v. Kyaw* (1988), 173 Ill. App. 3d 1034, 527 N.E.2d 1328, the appellate court found a thoracic surgeon qualified to be a reviewing health professional in a medical malpractice action alleging negligent failure to diagnose lung cancer from the X rays of the plaintiff. The instant case is similar to *Relaford* in that the medical malpractice action alleges the negligent failure to diagnose a fracture of the left orbital floor from the X rays of the plaintiff. The diagnostic X ray knowledge of an ophthalmologist on eye disorders is comparable to that of a thoracic surgeon on lung diseases. Accordingly, Kamen is qualified to be the reviewing health professional as to defendant Gutierrez.

Defendant Manh is alleged to be a physician licensed to practice medicine in all of its branches. Kamen possesses the same medical license. Thus, Kamen is qualified to be the reviewing health professional as to defendant Manh."

Foster would have this court restrict its analysis in *Moss* to considering whether a physician is a qualified reviewing health professional and refuse to extend it to a determination of who qualifies as an expert witness at trial. In *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 406-07, 572 N.E.2d 1030, 1040-41, wherein the expertise of the witness testifying at trial was considered, the court stated:

"When an expert is offered to establish the applicable standard of care and breach, a two-part test is used to determine the admissibility of the expert testimony. (*Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072.) First, it must be shown that the expert is licensed in the same 'school of medicine' to which the defendant-doctor belongs. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13; *Witherell v. Weimer* (1986), 148 Ill. App. 3d 32, 499 N.E.2d 46.) Secondly, the expert must demonstrate that he is otherwise qualified to give expert testimony on the case.

As stated in *Novey*, the 'school of medicine' doctrine dictates that 'the expert who establishes the practitioner's deviation from the pertinent standard of care must be both a licensed member of the school of medicine about which he opines and familiar with the ordinary methods, procedures, and treatments of the practitioners in the actual or similar community unless certain uniform standards apply regardless of either locality or available conditions or facilities.' (*Novey*, 176 Ill. App. 3d at 678.) In this case, plaintiff's expert, Dr. Mathews, was licensed to practice medicine in the State of Illinois and employed as the director of emergency services at Northwestern Memorial Hospital. He testified that he was board certified in internal medicine and emergency medicine. It seems clear, therefore, that Dr. Mathews is licensed in the same 'school of medicine' as Dr. Barton and that the first prong of the test for admission of expert testimony was satisfied.

However, it is the second prong of the test that presents problems for this court. Dr. Mathews testified that he was not an obstetrician or gynecologist and that his specialty was emergency medicine. Although he had testified as an expert in several cases, he stated that those cases involved the assessment and response to acute problems, such as would be seen in the emergency room. He had never worked in an obstetrical or gynecological ward, had attended patients delivering babies 'on occasion,' but apparently had never been involved in pregnancy-interruption procedures. He had never used the drug Prostin, had never seen it used and never observed the reactions of a patient receiving the drug. In fact, he had never had any experience with the drug in any manner and had not even read the insert and profile for the drug until he was asked to testify in the case. For these reasons this court finds that Dr.

Mathews was not competent to testify on the standard of care to be applied to Dr. Barton.

We realize, as plaintiff argues, that Dr. Mathews' criticism of Dr. Barton centered around his assessment of his patient and not his administration of any gynecological procedure. However, Dr. Barton's assessment of his patient should not be taken out of context of the setting in which it was made since the issue is whether he deviated from the accepted or customary medical standards at the time and place that the event occurred. Dr. Mathews was not qualified to give an opinion on this since he could not know what was customary practice for someone in Dr. Barton's position.''

■ Here, plaintiff tried to get a surgeon qualified to testify to the standard of care of radiologists. McAfee testified that in his work as a surgeon, he depends upon the expertise of a radiologist. In reviewing the standards set forth in section 8—2501 of the Code, specifically subparagraphs (a) and (b), no abuse of discretion has been established with regard to the trial court's refusal to allow McAfee to testify as to the standard of care of radiologists. No error. Since the plaintiff conceded at trial that without McAfee's testimony the directed verdict was appropriate, the judgment in favor of Foster is affirmed.

We next consider whether the jury's finding in this medical malpractice action that plaintiff was negligent was against the manifest weight of the evidence. This and the remaining issues relate only to defendant Aquino.

When plaintiff went to see Aquino on December 28, 1984, both plaintiff and Aquino testified that Aquino advised plaintiff he should return to the hospital in Springfield, but plaintiff advised Aquino he did not wish to return to St. John's Hospital. Suspecting atelectasis of the lungs and distention of the stomach, Aquino hospitalized plaintiff at St. Francis Hospital in Litchfield. Aquino testified that atelectasis refers to the condition of the patient's respiration being insufficient to expand the lung. It is usually caused by deficiencies in respiration, such as the air tubes being plugged. A tube was inserted to remove liquids from plaintiff's stomach, and plaintiff was not permitted to receive food or fluids through his mouth in order to allow the stomach to regain its proper functioning. Believing the stomach distention had improved, the tube was removed on January 1, 1985. In the late evening of January 1, 1985, plaintiff developed a left lower quadrant chest pain. Noting haziness in an X ray, Aquino inserted a tube into the chest cavity to drain fluid. On January 2, 1985, a tube was rein-

serted into plaintiff's stomach. On January 3, plaintiff's stomach was still not working on its own. After the incident occurring on January 1 and 2, 1985, Aquino suggested on a daily basis that plaintiff be transferred to Springfield. This occurred until January 4, when plaintiff finally agreed. However, plaintiff did not want to go back to St. John's or be treated by Farrell or McCormick. Therefore, after discussing the situation with Farrell, it was decided to transfer plaintiff to Memorial Medical Center under the care of Rogers.

Upon arrival at Memorial Medical Center, plaintiff was examined by Dr. Stuart Torgerson, a partner of Farrell. Torgerson found diminished breath sounds in the left lung. The right lung was normal. The examination of the abdomen was unremarkable and the remainder of the physical examination revealed no abnormal findings. There was nothing in Torgerson's notes about plaintiff's nutritional status. There was nothing acute or emergent about plaintiff's condition, *i.e.*, he was not in imminent danger of dying.

Rogers first saw plaintiff on January 5, 1985. At that time, Rogers described plaintiff as near death. An upper gastrointestinal study (upper-GI) revealed plaintiff's stomach was trapped in his left chest. Rogers found plaintiff's nutritional status to be poor and criticized Aquino for that. In addition, he opined that the placement of a tube in plaintiff's stomach caused a perforation in plaintiff's stomach, requiring—in addition to the removal of the stomach from the chest—the repair of the perforation and the decortication of one of plaintiff's lungs. Rogers stated that, after viewing the initial X ray taken of plaintiff at St. Francis Hospital, the failure of Aquino to diagnose the herniation at that time was not a deviation from the standard of care, but Aquino did deviate from the standard of care by failing to telephone McCormick on December 28, 1984. However, Rogers admitted that if Aquino had offered plaintiff the opportunity to be transferred back to Springfield and plaintiff refused, Aquino probably would not have had any choice.

McAfee stated that, although the stomach herniating into the chest is a complication occurring in less than 1% of all cases and atelectasis of the lung is a much more common complication of this type of surgery, the failure of Aquino to diagnose the herniation of the stomach into the chest and the failure to transfer immediately were deviations from the standard of care which almost resulted in plaintiff's death. The nutritional care plaintiff received was also a deviation from the standard of care. McAfee further opined that plaintiff's stomach was perforated when a stomach tube was inserted into plaintiff's stomach on January 2, 1985.

McCormick and Farrell testified about the number of telephone consultations they had with Aquino while plaintiff was hospitalized in Litchfield. In addition, Aquino's expert, Dr. Don Ramsey, testified Aquino did not deviate from the acceptable standard of care. The herniation of the stomach is an extremely rare complication following a Nissen fundoplication surgery, and since Aquino did not perform this type of surgery, he would not be expected to be aware of this complication. Ramsey opined that the perforation of the stomach did not result from the placement of a tube, but may have resulted from an ulcer. He believed the perforation occurred on January 1, 1985, causing the worsening of plaintiff's condition. He also opined it was correct not to feed plaintiff by mouth during his stay in St. Francis Hospital, and Aquino did not deviate from the standard of care in not ordering an upper-GI study since the patient was improving under the treatment based on his original diagnosis.

As a rebuttal witness, plaintiff stated he never refused a transfer from St. Francis Hospital. Mrs. Gill testified she told Aquino she did not want her husband to go back to St. John's Hospital or to be treated by Farrell or McCormick. Plaintiff told her he did not care to go back to Springfield, but he did not say that he would not. According to Mrs. Gill, Aquino did not discuss transferring plaintiff to another facility until January 4, 1985. Also according to Mrs. Gill, when plaintiff was admitted to St. Francis, Aquino stated he should send plaintiff back, but he was going to admit him.

Plaintiff argues the evidence does not establish that he was negligent at all or that his negligence contributed to his injury. As already noted, the jury's verdict assigned 50% of the responsibility for plaintiff's damages to plaintiff's negligence.

■ Evidence of plaintiff's negligence in refusing a physician's advice, resulting in delay which might have contributed to the severity of plaintiff's condition, may be considered.

> "In determining whether the verdicts are against the manifest weight of the evidence, the reviewing court must be convinced that the opposite result is clearly evident from a review of the record. The test is whether the result reached by the jury was reasonable, based on the evidence. (*Chizmar v. City of Virden* (1987), 162 Ill. App. 3d 653, 515 N.E.2d 1294.) If the verdict has evidentiary support in the record, the reviewing court will not substitute its judgment for that of the jury. (*Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 458 N.E.2d 530.)" *Byrne v. S C M Corp.* (1989), 182 Ill. App. 3d 523, 545, 538 N.E.2d 796, 810.

Courts will overturn a comparative negligence verdict if the distribution of fault is against the manifest weight of the evidence. (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 339-40, 498 N.E.2d 1135, 1138.) In *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 339-40, 515 N.E.2d 68, 77, the Illinois Supreme Court declined to overturn a jury verdict attributing 40% of the plaintiff's damages to her negligence in taking her medicine too frequently and failing to heed her physician's warnings against immobility, insufficient physical activity, and long car trips.

■ The jury in this case could reasonably have found that plaintiff was negligent in refusing his physician's suggestion of returning to St. John's Hospital. Therefore, plaintiff was not free from negligence as a matter of law. In addition, the jury could reasonably have found that 50% of the fault of his injury was attributable to the negligent refusal by plaintiff.

We consider the associated issues of whether the trial court committed an abuse of discretion in refusing to admit plaintiff's exhibit Nos. 1 and 6, being medical bills from Memorial Medical Center and Dr. Rogers, where there was no evidence as to which items on the bills were necessitated by the alleged medical malpractice of defendant Aquino, and whether the trial court committed an abuse of discretion in refusing the plaintiff's offer of proof concerning what the testimony of a hospital administrator would be as to the average cost of a hiatal hernia repair. McAfee and Rogers testified that the delay in diagnosis and treatment resulted in a much more complicated surgery and a prolonged hospitalization. In an attempt to prove his damages, plaintiff offered into evidence plaintiff's exhibit No. 1, the itemized bill for 23 days' hospitalization at Memorial Medical Center, amounting to $19,625.98, and plaintiff's exhibit No. 6, the bill of Rogers, amounting to $2,550. Both bills had been paid. Plaintiff failed to introduce testimony explaining which portions of these bills were incurred as a result of negligence of a party defendant as opposed to being incurred for an admittedly necessary surgical repair. In ruling the exhibits inadmissible, the trial judge stated:

> "[O]n Plaintiff's Exhibit [No.] 1 there are literally hundreds of entries that the jury would have no basis, no ability to determine what would have happened if this man would never have gone to Litchfield, what [*sic*] of these expenses would have been incurred anyway.
>
> * * *
>
> *** I mean how would a juror go through this list and decide if the lab blood culture of $33.55 relates to surgery occasioned by the alleged negligence or surgery that was going to occur because

of what you all described as a natural—a natural complication that arose from the first surgery?

\* \* \*

I've been waiting for that in your case, wondering how you're going to do it and which of the doctors or medical bill were going to do it for you. There has [sic] to be people throughout who are qualified to break these down, but absent any evidence on which this jury can do it, [it is] not those twelve people sitting over there.

You've got a significant problem with a couple of these bills because they relate to surgery that, granted, was a much more involved surgery but with absolutely no testimony as to how to break it down."

In an attempt to satisfy this requirement with regard to plaintiff's exhibit No. 1, plaintiff made an offer of proof of the testimony of Gregory E. Weller, vice-president of finance at Memorial Medical Center. Prior to the offer of Weller's testimony, the judge explained his ruling again:

"I mean the difficulty that I continue to have is that if you've got in Plaintiff's Exhibit [No.] 1, a very, very detailed breakdown of every package, if you will, that was utilized in this man's treatment, that is—appears to be capable of being broken down and attributed to each type of surgery, and you never came forward with someone who would do that, and I'm not sure that the witness you're proposing today really is intending to do that, to break it down and say, 'All right, this is item number 33; it would have been needed in any event; this is item number 34; it was needed because the surgery was longer,' you don't have a situation where we are incapable of breaking it down. You have a situation that, to me, is very well suited to breaking it down. You just haven't brought anybody in to do it.

\* \* \*

If you have a witness who can tell me what a repair of the herniation of the stomach into the chest wall would have cost in 1985 in terms of ancillary hospital services, I think that would be very probative and relative [sic] and admissible.

I think only that Dr. Rogers can testify as to what his fee would have been but for the complications, and that was not asked of him."

Weller considered the "normal" cost in 1991 for a four- to five-day hospitalization for a hiatal hernia repair to be between $4,500 and $5,500. Stating he was familiar with the increase in charges since 1985, he

would testify the charge for this type of procedure in 1985 would have been between $3,130 and $3,800.

The trial court denied the offer of proof, but stated that Weller's testimony did establish the basis for calculating the charge incurred for the operating room, and suggested a stipulation as to the operating room costs. The trial judge had also previously suggested a stipulation on the per-day room cost at Memorial Medical Center since there had been testimony about additional hospital days required. The parties agreed to stipulate. A stipulation by the parties as to the Memorial Medical Center charges was presented to the court as follows:

"[Plaintiff's Counsel]: We have identified five days in the ICU at $500, eight days regular hospital care, [$]229, and five days at [$]194, which we believe would have been—would not have been required but for the complication.

We have reduced the operating room charge by ten—by two units of 15 minutes resulting in the bill of 1982 for the operating room, plasma $91, the jejunostomy kit [$]55.44, and the parenteral fluids [$]379.17 for a total of [$]7809.61.

I intend, and I think [defendant's counsel] has agreed, that I may rightfully discuss that sum in argument.

[Defense Counsel]: Without waiving a previous objection, your Honor, I have stipulated with [plaintiff's counsel] that those figures are, in fact, reflected in the bill."

In ruling on the admission of evidence, the trial judge has broad discretion. (*Zajac v. St. Mary of Nazareth Hospital Center* (1991), 212 Ill. App. 3d 779, 788, 571 N.E.2d 840, 846.) Even though the members of the reviewing court might have ruled differently, the trial judge's ruling will not be overturned on appeal unless it clearly appears from the record that an abuse of discretion occurred. *People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1161.

■■■ In this case, the testimony was that the herniation of plaintiff's stomach into his chest occurred in St. John's Hospital. This condition was not discovered there. Nor, apparently, did Aquino subsequently discover it. Rogers testified that had the condition been discovered earlier, the corrective surgery would have involved entry through an abdominal incision and would have been relatively simple. Of course, the repair of the lung would also not have been involved had there been no perforation to the stomach.

"The law is settled in this State that in order to recover for medical and surgical services it is necessary that two things be proven: First, that the claimant has paid or become liable to pay a specific amount; and second, that the charges made were rea-

sonable charges for services of that nature. [Citations.] *** The payment of the bill of a physician is *prima facie* evidence that it is reasonable. [Citations.] Payment of the bill sufficing to make a *prima facie* case that the charge of three dollars was in fact reasonable, it was proper for the jury to consider this item as an element of damages. The given instruction states that physicians' bills should be allowed, 'if any' are proven, and it must be assumed the jury did not consider items not proven." (*Wicks v. Cuneo-Henneberry Co.* (1925), 319 Ill. 344, 349, 150 N.E. 276, 278.) However, in proving damages, the plaintiff has the burden to establish a reasonable basis for computing the damages, since an award of damages may not be based on conjecture or speculation and must be shown to have a causal relationship to the complained-of wrong. *Taylor v. R.D. Morgan & Associates, Ltd.* (1990), 205 Ill. App. 3d 682, 688, 563 N.E.2d 1186, 1189-90.

In *Taylor*, the appellate court found that the trial court had not erred by directing a verdict, stating plaintiff failed to prove she paid or was liable to pay a specific amount directly attributable to defendant's alleged medical malpractice. Plaintiff minor was injured in a motorcycle accident. In a malpractice action, he sued to recover damages arising from the subsequent medical treatment and his mother sued to recover for medical expenses. The verdict on the mother's claim was directed because, although she testified she paid all or most of the bills, "there is no delineation in the record between the amount of the bills incurred as a result of the original injury and the amount of the bills incurred as a result of the defendant's alleged misconduct. There is no way that the jury could have appropriately assessed the damages attributable to the defendant's alleged misconduct if that issue had been presented to them." *Taylor*, 205 Ill. App. 3d at 687-88, 563 N.E.2d at 1189.

Where a defendant has caused damages, but the damages caused by him cannot be separated from damages caused by others, it is as logical to award plaintiff the entire amount of damages as it is to award plaintiff no damages. (See *Gaunt & Haynes, Inc. v. Moritz Corp.* (1985), 138 Ill. App. 3d 356, 363, 485 N.E.2d 1123, 1128.) If defendant is viewed as the wrongdoer it is more logical for plaintiff to recover the entire amount than for defendant to pay nothing. "A party cannot be permitted to escape liability for his wrongful acts simply because the plaintiff's damages are difficult to prove." (*Tri-County Grain Terminal Co. v. Swift & Co.* (1969), 118 Ill. App. 2d 313, 322, 254 N.E.2d 311, 315 (involving an intentional tort); see also *Nisbet v. Yelnick* (1984), 124 Ill. App. 3d 466, 472, 464 N.E.2d 781, 784.) A defendant required to pay the entire damage award may be able to obtain contribution from code-

fendants. (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*) The court should accept the best evidence which the nature of the subject will permit, not reject it as conjecture or speculation. *Tri-County*, 118 Ill. App. 2d at 322, 254 N.E.2d at 315; W. Keeton, Prosser & Keeton on Torts §52, at 345 (5th ed. 1984) ("some rough practical apportionment").

A particular item of evidence is not inadmissible because it is insufficient to establish all of plaintiff's case. Evidence is relevant, and usually admissible, if it tends to prove a fact in issue, that is, if it tends to make a matter in issue more or less probable. Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 167-68 (5th ed. 1990).) The trial court here had the discretion to admit the entire bill and Weller's testimony. Where a rational basis can be found for some reasonable apportionment of damages, however, the trial court may require that plaintiff present that evidence and not simply offer the jury evidence of the entire amount. See *Gaunt*, 138 Ill. App. 3d at 363, 485 N.E.2d at 1128.

On the basis of *Taylor*, we determine the trial court did not commit an abuse of discretion by refusing to admit plaintiff's exhibit Nos. 1 and 6. Weller was not qualified to testify that the cost of a simple reduction of the stomach from the chest equated with the cost of hiatal hernia repair and, therefore, his testimony could not establish the relative cost of the surgical repair attributable to Aquino's negligence. In view of the stipulation of the parties as to the hospital charges, the trial court's ruling as to Weller's testimony was not error.

The next issue is whether the trial court committed an abuse of discretion in refusing to allow plaintiff's expert to testify as to the residual effects of the decortication of plaintiff's lung pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220). Rogers testified that because of the perforation of the stomach, which Rogers attributed to the placement of the tube because he observed the tube protruding through the hole, stomach contents, food and bacteria leaked out and caused an infection. Rogers described the stomach contents as being a thick batter or sticky material called an inflammatory exudate which entrapped the lung and did not allow it to expand. The removal of this matter, referred to as decortication, was described as peeling it off the lung.

Plaintiff attempted to have McAfee testify about any residual effects plaintiff might experience as a result of decortication of the lung. The trial judge sustained the objection to this testimony based on non-disclosure during discovery. In his December 30, 1988, deposition,

McAfee, after answering questions about the Nissen fundoplication, was asked the following questions and gave the following answers:

"Q. [By McCormick's counsel:] Were you asked to form any opinion concerning any residual damages to Mr. Gill?

A. [By McAfee:] No. Nobody has asked me that.

Q. You were not provided with any follow-up information?

A. No.

Q. And you don't know his condition today?

A. I do not.

Q. Would you expect him to have any residuals from the repair surgery undertaken by Dr. Rogers?

A. Well, Dr. Rogers took down at least part of the wrap. I guess you might assume, 'Well, then it doesn't work,' but then I happen to know that the more up-to-date procedures don't make a very big wrap in the first place. Now they do it with one stitch. Some guy up in Washington University or somewhere says that this should be a floppy wrap and not very long, so I don't know. If it doesn't work, I guess I'd say it was due to him taking it down."

This final answer refers only to the Nissen fundoplication which had to be undone during Rogers' surgery.

At trial, the defendant objected to plaintiff's questioning of McAfee about the residual effects of the decortication because plaintiff had not disclosed an opinion on this during discovery. The trial court's ruling was explained to plaintiff as follows:

"THE COURT: It would appear that [from] your answers to interrogatories regarding the scope of the [Rule] 220 disclosure you [were asked] to state the subject matter; you attached Dr. McAfee's report.

* * *

Now there is a question on page 52, line 23 of the deposition which appears to be very similar to the question that [plaintiff's counsel] asked shortly before this break: 'Would you expect him to have any residuals from the repair surgery undertaken by Dr. Rogers?'

* * *

I think we have two separate issues here.

One is: Are there residuals from Dr. Aquino's care as a general proposition? Then the more narrow issue: Are there residuals from the repair surgery by Dr. Rogers?

As to the first issue, I still don't see anywhere that that was disclosed that this expert would testify in that subject matter, and

that in my opinion is significant and separate inquiry, review, and analysis.

\* \* \*

Now, as far as the question, residuals and repair of Dr. Rogers' surgery, it does appear that that question was asked at the deposition.

\* \* \*

\*\*\* [H]e gives a rather nonresponsive answer after he immediately engages in a series of questions saying that nobody has asked him to talk about residual damages.

\*\*\*

And so I mean he has affirmatively stated on the record that he has not formed any opinion on residual damages, because nobody—which I assume would include his employer—has asked him to do that, which to me leads these attorneys to believe that he is not testifying as an expert in that subject."

Illinois Supreme Court Rule 220(c) requires a party retaining or employing an expert witness to answer propounded interrogatories regarding the subject matter on which the expert is expected to testify, his conclusions and opinions and bases therefor, and his qualifications. In addition, the rule requires the answers to interrogatories to be seasonably supplemented when additional information becomes known to the party or his counsel. (134 Ill. 2d R. 220(c).) Rule 220(d) precludes an expert witness' testimony to the extent it "may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings." (134 Ill. 2d R. 220(d).) An exception is made, however, if no inquiry into the matters was undertaken during discovery. (134 Ill. 2d R. 220(d); see also *Baird v. Adeli* (1991), 214 Ill. App. 3d 47, 60-61, 573 N.E.2d 279, 286-87, *appeal denied* (1991), 141 Ill. 2d 536, 580 N.E.2d 108 (discussion of the interrelationship of Rules 220(c) and (d)).) The trial court did not commit an abuse of discretion in limiting McAfee's testimony since plaintiff did not disclose McAfee had an opinion about the residual effect of the decortication and McAfee limited his response to the undoing of the Nissen fundoplication when asked during a discovery deposition if he would expect plaintiff to have any residuals from the repair surgery undertaken by Rogers.

■ Next, we consider whether the damages assessed by the jury against defendant Aquino in this medical malpractice action were inadequate and proven elements of damages were ignored. Ordinarily, the amount of damages to award is a question of fact for the jury to determine, but while reviewing courts are reluctant to interfere with the jury's assessment of damages, a new trial may be awarded if the award is

palpably inadequate, a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered. (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6; *Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 194-95, 412 N.E.2d 1037, 1047.)

> "Since, as a general rule, a new trial will not be granted on the ground that damages in personal injury actions are considered to be inadequate, appellate review of the granting of a new trial limited solely to the issue of damages is essentially a review of the trial court's discretion. An abuse of discretion will be found where there is no recognizable basis in the record to support the granting of a motion for a new trial. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647-48, 432 N.E.2d 1267, 1272.) \*\*\*
>
> The question of damages is one of fact for the jury and courts will not interfere with the jury's assessment of damages unless: (1) the award is palpably inadequate or a proved element of damages has been ignored; or (2) the amount of the verdict is shown to be erroneous or the result of passion or prejudice; or (3) it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by plaintiff. *Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 194-95, 412 N.E.2d 1037, 1047."

(*Greco v. Coleman* (1985), 138 Ill. App. 3d 317, 322, 485 N.E.2d 1118, 1121.)

In this case, the jury returned a verdict in which it was determined that plaintiff's total damages amounted to $55,000, including past reasonable medical expenses of $15,000, disability and disfigurement of $10,000, past wages lost of $5,000, and past pain and suffering of $25,000. After considering that plaintiff's negligence was determined responsible for 50% of the damages, the plaintiff's recoverable damages were reduced to $27,500. The jury's itemized verdict specifically provided that no damages were to be awarded for aggravation of any preexisting condition, future reasonable medical expenses, future lost wages, or future pain and suffering reasonably certain to be experienced. Plaintiff argues the damages were inadequate and contrary to the evidence. Plaintiff specifically urges this court to find that medical bills were ignored and the evidence of disability and past and future pain and suffering was disregarded.

Plaintiff points out that the total of the past medical expenses exceeded the $15,000 awarded by the jury for this line item. There was, of course, the stipulation as to the bill for Memorial Medical Center,

amounting to $7,809.61. Plaintiff's exhibit No. 2 is McCormick's bill, amounting to $1,239. Plaintiff's exhibit No. 3 is a $5,765.10 bill from St. Francis Hospital. Aquino's bill was $702 (plaintiff's exhibit No. 4). Plaintiff's exhibit No. 5 is a St. John's Hospital's bill of $5,420.81. Gastrointestinal Associates, Farrell's organization, charged plaintiff a total of $145 (plaintiff's exhibit No. 8). Associated Anesthesiologists of Springfield, Ltd., charged plaintiff $1,232 for services rendered January 7, 1985 (plaintiff's exhibit No. 9). Laboratory charges from Springfield Clinic (plaintiff's exhibit No. 10) from January 6 to January 17, 1985, amounted to $560. Central Illinois Allergy and Respiratory Service, Ltd., charged $598 for care to plaintiff in Memorial Medical Center from January 5 to 27, 1985 (plaintiff's exhibit No. 11). Plaintiff's exhibit No. 12 was an $85 bill from Prairie Cardiovascular Center and plaintiff's exhibit No. 13 was a $399 bill from Springfield Anesthesia Ltd. Both of these bills relate to care at St. John's Hospital. Springfield Radiologist charged $15 for X rays taken December 16, 1984 (plaintiff's exhibit No. 14). For transportation from St. Francis to Memorial Medical Center, the ambulance fee was $127.50 (plaintiff's exhibit No. 15). Foster Radiology charged plaintiff $132 (plaintiff's exhibit No. 16).

The total of these exhibits is $24,230.02. However, the jury could reasonably have found that none of the care provided to plaintiff prior to Aquino's involvement was attributed to his negligence. That would reduce the total by $7,303.81 (plaintiff's exhibit Nos. 2, 5, 8, 12, 13, 14) to $16,926.21. Plaintiff argues that Rogers had to undo the Nissen fundoplication. However, the jury could find that he may have had to undo that simply because of the herniation of the stomach into the chest, a condition which the jury could reasonably find was not caused by Aquino's negligence. There may, in addition, have been some of the St. Francis hospitalization costs which the jury did not consider Aquino's negligence to have caused, depending on when the jury determined Aquino's negligence occurred. As a result, we cannot conclude that the jury ignored evidence of the plaintiff's medical expenses in arriving at the verdict.

> "The mere fact that a verdict is less than the special damages or out-of-pocket expenses claimed does not necessarily mean that the award is inadequate. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502, 481 N.E.2d 50, 53.) Although the mathematical computation of bills received and earnings lost may often be a useful measure for the determination of the proper award, it does not automatically constitute a minimum level of recovery which is binding upon both a jury and a court

of review. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 503, 481 N.E.2d 50, 53; *Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 173, 481 N.E.2d 893, 897.)" *Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 1044, 495 N.E.2d 141, 145.

Plaintiff also argues the jury disregarded evidence and made an inadequate assessment of plaintiff's disability and past and future pain and suffering. The jury awarded $25,000 for past pain and suffering.

"It is always difficult to fix a precise dollar value of compensation for personal injuries, especially when based primarily on pain and suffering. (*Orlandi*, 9 Ill. App. 3d at 632, 293 N.E.2d at 339.) And, the very nature of personal injury cases makes it impossible to establish a precise formula to determine whether a particular award is excessive or not. (*McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 230, 481 N.E.2d 787, 800.) While the extent of the injuries suffered, the claimant's age, the possibility of deterioration in the future, medical expenses incurred, past and future wage losses and any restrictions that the injuries may have placed on the daily activities of the injured claimant are all factors to be considered (see *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 359, 484 N.E.2d 542, 548), the determination of an adequate award is peculiarly within the province of the jury. Accordingly, great weight must be given to that determination. (See *McMahon*, 135 Ill. App. 3d at 230, 481 N.E.2d at 800.) Only if the amount falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience will we as a reviewing court reverse the jury's award. (See *Shaheed*, 137 Ill. App. 3d at 359, 484 N.E.2d at 548.)" (*Salo v. Singhurse* (1989), 181 Ill. App. 3d 641, 645, 537 N.E.2d 339, 342.)

Just as there is no precise formula for determining whether a verdict is excessive, there is also no precise formula for determining when a verdict is inadequate. With regard to future pain and suffering and disability, plaintiff's brief points to evidence which plaintiff argues would support the inference that the plaintiff is and will continue to be disabled and subjected to pain and suffering. However, there is other evidence which, if the jury believed it, would support the finding of no disability and no future pain and suffering.

Plaintiff testified he was employed at the Milnot Company. Prior to surgery, his work week consisted of 40 hours plus some overtime.

At the Milnot Company, he still worked the same job he had before, and his performance was apparently satisfactory to his supervisors. He was still putting in 40 hours per week plus overtime. His job was to load the product on pallets in a trailer. When he first went back to work, he had help, but he no longer had help. The biggest problem he had had since the operation was the inability to perform at a normal pace without substantial discomfort in the left chest area, as well as the fatigue and loss of strength he experienced. He also complained of shortness of breath on occasion and a constant pain on his left side from his stomach to his back.

Dr. Jerome Epplin became plaintiff's physician after the operations. He first saw plaintiff on January 16, 1986. He last saw plaintiff on June 20, 1989, although they called in a prescription for him on December 26, 1989. During that time, plaintiff never complained of symptoms of reflux esophagitis, and Epplin did not treat him for that. As for plaintiff's complaint of depression, Epplin described plaintiff as a somewhat depressive personality and stated he did not believe the depression is related to the operation. Other physical ailments plaintiff complained of, such as diarrhea, are not related to the surgery. Epplin opined that plaintiff's fatigue was due more to plaintiff's depression than to surgical complications. On October 17, 1986, when plaintiff complained of fatigue, X rays were taken which disclosed "scarring of the left lung base with pleural diaphragmic adhesions." Epplin stated that merely because there is scarring does not mean there is a problem with it. The chest soreness of which plaintiff complained in 1988 was described as "vague" in the doctor's notes, although his nurse recorded complaints of pain in both axillary areas, referring to the armpits. The X ray in 1986 showed adhesions between the pleura and the diaphragm. With adhesions, there can be pleurisy type pains. Epplin, although recognizing it is possible the pain complained of could be related to the surgery, stated he was never impressed that there was a pleuritic pain. Nor has Epplin ever considered plaintiff malnourished in light of the results of tests performed on plaintiff.

The jury could reasonably find from plaintiff's own testimony that he had no disability. In addition, Epplin's testimony, which came very near the end of the trial, could have convinced the jurors that plaintiff was exaggerating his pain and suffering. As a result, the jury's verdict will not be overturned.

■ The final issue is whether the trial court erred in allowing defense counsel to comment on plaintiff's burden of proof during opening argument. In opening argument, it is improper for a party to

argue his position with regard to an issue or comment on matters which are clearly inadmissible, such as an offer of compromise. (See *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 279-80, 522 N.E.2d 699, 705; *Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 645, 445 N.E.2d 63, 66.) In *Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 933, 479 N.E.2d 1091, 1096, the court considered whether plaintiffs were entitled to a new trial because defendant's attorney, during opening statement, commented on plaintiffs' burden of proof and ruled as follows:

"[T]heir argument overlooks the fact that the trial court admonished the jury both prior to opening statements and subsequent to the presentation of evidence that the remarks of counsel are not evidence and that the jury should disregard any statement, argument or remark which was not based upon the evidence.

In matters involving arguments or remarks of counsel, the question of the prejudicial impact, if any, upon a jury is within the sound discretion of the trial court and will not be disturbed on review unless there has been a clear abuse of discretion."

In the case at bar, evidence was presented during five days of trial from May 15 to 21, 1991. As in *Zelinski*, the jury was instructed before opening statements that argument of counsel was not evidence and prior to deliberation that arguments of counsel are not evidence and should be disregarded if the remark had no basis in evidence. In addition, the trial court properly instructed the jury as to the plaintiff's burden of proof. Therefore, the error, if any, in the opening statement was harmless.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

KNECHT and COOK, JJ., concur.