2024 IL App (4th) 230679

NO. 4-23-0679

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 30, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JEREMY BELKNAP and SHANE BELKNAP, as | ) | Appeal from the |
| Independent Co-Administrators of the Estate of Stephanie | ) | Circuit Court of |
| E. Belknap, Deceased, | ) | Peoria County |
|            Plaintiffs-Appellants, | ) | No. 18L104 |
|            v. | ) | |
| DAVID CRAWFORD; THE PEORIA SURGICAL | ) | |
| GROUP, LTD., an Illinois Corporation; CYNTHIA | ) | |
| MARTIN; and THE METHODIST MEDICAL CENTER | ) | |
| OF ILLINOIS, an Illinois Corporation, | ) | |
|            Defendants, | ) | Honorable |
| (Cynthia Martin and The Methodist Medical Center of | ) | Frank W. Ierulli, |
| Illinois, Defendants-Appellees). | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1         On July 10, 2019, plaintiffs Jeremy Belknap and Shane Belknap, as independent

co-administrators of the estate of Stephanie E. Belknap, deceased, filed a third-amended survival

and wrongful death action against defendants David Crawford; the Peoria Surgical Group, Ltd.,

an Illinois Corporation; Cynthia Martin; and the Methodist Medical Center of Illinois, an Illinois

Corporation (Methodist). Plaintiffs alleged Stephanie suffered serious injuries as a result of

medical care she received at Methodist from Dr. David Crawford and nurse Cynthia Martin.

Stephanie later died from her injuries.

¶ 2         On July 31, 2023, the trial court granted Martin and Methodist's motion for

summary judgment with regard to plaintiffs' counts in the third-amended complaint against them

(counts VII, VIII, IX, and X). Pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), the court found no just reason for delaying appeal of its summary judgment order. Plaintiffs appeal, arguing the court erred in granting the motion for summary judgment. According to plaintiffs, they presented sufficient expert testimony that Martin's failure to communicate Stephanie's information to the treating physicians was a proximate cause of her injuries and death. Further, they argued the court erred in finding summary judgment was required pursuant to our supreme court's decision in *Gill v. Foster*, 157 Ill. 2d 304 (1993). We reverse the trial court's summary judgment order and remand this case for further proceedings.

¶ 3                              I. BACKGROUND

¶ 4            According to plaintiffs' third amended complaint, on or about September 22, 2016, Stephanie Belknap presented to defendant Dr. David Crawford for treatment of gastroesophageal reflux disease with hiatal hernia. Dr. Crawford determined she was an appropriate candidate for partial fundoplication, also known as a "toupet procedure." The complaint alleged Stephanie "was a substantial risk for acute recurrence of hiatal hernia due to a known history of retching and hyperemesis." On January 16, 2017, Dr. Crawford "attempted" the procedure on Stephanie at defendant Methodist in Peoria, Illinois. According to the complaint, "During the 24 hours immediately following the surgery, and before her discharge from the hospital, Stephanie Belknap was gagging and retching all night, not tolerating a diet, and had very poor input and output."

¶ 5            According to plaintiffs' complaint, Crawford negligently failed to appreciate Stephanie's risk of recurrent herniation, took inadequate surgical measures to prevent Stephanie's recurrent herniation, and discharged Stephanie while she was in an unstable condition despite her symptoms. Stephanie later suffered an acute recurrence of her hiatal herniation and became septic because she did not have appropriate treatment. She died of her injuries on January 21, 2017, at

the age of 23.

¶ 6        Plaintiffs alleged nurse Cynthia Martin was in charge of monitoring Stephanie's condition beginning around 7 a.m. on January 17, 2017. Between 7:27 a.m. and 12:43 p.m., Martin observed that Stephanie was in constant pain and had intermittent crying, ongoing anxiety, failure to control her pain, and also had signs of tachycardia and hypoxia. Plaintiffs alleged Martin was guilty of one or more of the following negligent acts or omissions: "(a) Failed to fully report her observations to Dr. Esparaz; and/or (b) Failed to fully report her findings and observations to Dr. Crawford." According to plaintiff's complaint, "[a]s a direct and proximate result of the acts and/or omissions of *** Martin, Stephanie Belknap failed to receive appropriate treatment for a recurrence of hiatal hernia, thereby becoming septic." Plaintiffs also alleged she "died of her aforementioned injuries on January 21, 2017[,] at the age of 23." Further, plaintiffs alleged Martin was an employee and/or agent of Methodist and was acting within the course and/or scope of her employment when providing care for Stephanie.

¶ 7        Plaintiffs' complaint included survival actions and wrongful death claims against Crawford (counts I and II), the Peoria Surgical Group, Ltd., who allegedly employed Crawford (counts III and IV), Dr. Joseph Esparaz, who was a surgical resident (counts V and VI), Martin (counts VII and VIII), and Methodist (counts IX and X), as Martin's employer.

¶ 8        On June 23, 2023, nurse Martin and Methodist filed a motion for summary judgment. They argued any causal chain with regard to Martin's alleged negligence was severed when Drs. Crawford, Esparaz, and Mark Sarran evaluated Stephanie prior to discharging her from the hospital. As a result, according to the motion, "Plaintiffs will be unable to identify any evidence establishing that Nurse Martin's alleged deviations from the standard of care were a proximate cause of [Stephanie's] injuries." Later in their motion, Martin and Methodist asserted the situation

in this case is nearly identical to the situation in *Gill*, 157 Ill. 2d 304. Martin and Methodist also argued plaintiffs had not put forth any expert testimony establishing Martin's alleged deviations from the nursing standard of care proximately caused Stephanie's injuries. The movants attached the transcripts of the discovery depositions of Martin, Dr. Crawford, Dr. Esparaz, Dr. Sarran, Lynn Barber (Stephanie's mother), and Dr. Jeffrey Allen. They also attached plaintiffs' amended witness disclosures pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018).

¶ 9       On July 7, 2023, plaintiffs filed a response to the motion. Plaintiffs claimed "Martin was negligent for failing to verbally report 10 out of 10 pain, dietary intolerance, and abnormal vital signs to the surgical team both before and after the discharge decision" and Methodist was vicariously liable for Martin's negligent conduct. According to plaintiffs, Martin and Methodist's motion omitted any mention of plaintiffs' nursing expert (Polly Gerber Zimmerman, R.N.) and their causation expert (David Talan, M.D.). Further, plaintiffs stated the moving parties also failed to reference the deposition testimony of Jeanette Bell, R.N., who worked the night shift of January 16, 2017, into the early morning hours of January 17, 2017. Plaintiffs attached the deposition testimony of these witnesses to their response.

¶ 10       Plaintiffs noted proximate cause is normally a fact question for the trier of fact. Further, according to plaintiffs, Martin and Methodist's reliance on *Gill* was misplaced because the facts in the instant case are factually inapposite. In addition, plaintiffs noted Zimmerman, their expert nurse witness, testified in her deposition that Martin's lack of verbal communication with Dr. Crawford and the resident physicians was negligent and contributed to Stephanie's injuries and death. Plaintiffs also pointed to the following testimony from Dr. Allen:

> "Based on Dr. Crawford's testimony, (Martin) didn't convey to him the issues that (Stephanie) was having. That she was having, you know, persistent maximum

scores on the pain scale, she wasn't eating her lunch. She only ate a fourth of her breakfast. So those are things that—look it cuts both ways. I mean he should inquire about it, but they also should tell him about it. Those are crucial points to determine if the patient needs to be discharged[.]"

According to Allen, a reasonable surgeon with the information Martin should have provided to Dr. Crawford and the residents would have done the following:

"Well, I think if someone has the bad pain, has the inability to eat and has the tachycardia, then I think to be within the standard of care you would keep the patient overnight … and you would check labs, CBC, CMP. If there was a worry for a perforation, you would go do a gastrograph and swallow x-ray."

Plaintiffs concluded their response to the motion for summary judgment by arguing ample evidence existed from the treating nurses and doctors and the retained experts to conclude Martin breached the standard of care for a nurse, the surgical team relied on nurses to adequately and accurately report Stephanie's condition to them, the physicians were deprived of relevant information in deciding to discharge Stephanie, and "a later discharge would have resulted in a successful surgical revision without death or other complications."

¶ 11        On July 19, 2023, Martin and Methodist replied to plaintiffs' response. They argued a nurse cannot offer an expert opinion on proximate cause. They also indicated plaintiffs did not claim the existence of a genuine issue of material fact. Further, the movants asserted Dr. Talan did not provide an expert opinion related to Martin. In addition, according to Martin and Methodist, "[t]o prove their case, Plaintiffs were required to have a physician testify that if Dr. Crawford had known whatever it is they claim Nurse Martin failed to communicate, then he would have, or a reasonable physician would have, delayed the discharge or reached a different diagnosis. That

opinion simply does not exist in Plaintiffs' Response brief or in this case at all."

¶ 12 On July 25, 2023, the trial court heard arguments on the motion for summary judgment and granted the motion, explaining its decision as follows:

"Summary judgment is appropriate when there's no genuine question of fact regarding the nurse's actions in this case as it relates to the fact pattern that I've been presented. I believe *Gill* is on point.

Here, the complaint against Martin is that she was negligent for failing to report Ms. Belknap's condition to the doctors before and after their discharge decision. However, I believe *Gill* is on point here. The doctors examined the patient, made the discharge decision at or about 1:15 and were aware of her complaints. I direct any review in court to Dr. Crawford's testimony, page 105, lines 21 through 24, which indicate that he was aware that she had some pain.

So, with that, I'm going to grant motion for summary judgment, and Nurse Martin and Methodist Medical Center will be out of the case."

The court then entered a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), finding no just reason for delaying an appeal of its order granting Martin and Methodist's motion for summary judgment.

¶ 13                                   II. ANALYSIS

¶ 14 Plaintiffs' complaint in this case is based on the defendants' alleged medical malpractice. To prevail in a medical malpractice case,

"a plaintiff must prove: (1) the proper standard of care in the medical community by which the physician's treatment should be measured; (2) that the physician negligently breached or deviated from the standard of care; and (3) that the resulting

- 6 -

injury to the patient was proximately caused by the physician's deviation from the standard of care." *Buck v. Charletta*, 2013 IL App (1st) 122144, ¶ 57.

¶ 15                                    A. Summary Judgment Principles

¶ 16        As previously stated, the trial court explained its summary judgment ruling as follows:

> "Summary judgment is appropriate when there's no genuine question of fact regarding the nurse's actions in this case as it relates to the fact pattern that I've been presented. I believe *Gill* is on point.
>
> Here, the complaint against Martin is that she was negligent for failing to report Ms. Belknap's condition to the doctors before and after their discharge decision. However, I believe *Gill* is on point here. The doctors examined the patient, made the discharge decision at or about 1:15 and were aware of her complaints. I direct any review in court to Dr. Crawford's testimony, page 105, lines 21 through 24, which indicate that he was aware that she had some pain."

When reviewing a trial court's order granting summary judgment, we apply a *de novo* standard of review. *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001).

¶ 17        Pursuant to section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2022)), summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." However, as our supreme court has made clear, summary judgment is a drastic means of disposing of litigation. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007). Before a trial court grants a motion for summary judgment, the party moving for summary judgment must

establish his right to summary judgment is clear and free from doubt. *Id.* A court must construe both the pleadings and the evidentiary material in the record strictly against the moving party when deciding a motion for summary judgment. *Buck*, 2013 IL App (1st) 122144, ¶ 56. A genuine issue of material fact exists if the facts are in dispute or reasonable minds could draw different inferences from the undisputed facts. *Id.*

¶ 18                                 B. Applicability of *Gill v. Foster*

¶ 19            Plaintiffs argue the trial court erred in finding that summary judgment was required pursuant to *Gill.* According to plaintiffs, questions of fact exist whether Dr. Crawford was entirely aware of the trend of Stephanie's condition during the period from completion of her surgery until Drs. Crawford, Esparaz, and Sarran met with her around 1 p.m. on January 17, when Dr. Crawford made the ultimate decision to discharge Stephanie from the hospital.

¶ 20            In *Gill*, the plaintiff entered St. John's Hospital (St. John's) in Springfield, Illinois, around December 19, 1984, for surgery to correct his reflux esophagitis, a chronic condition. *Gill v. Foster*, 232 Ill. App. 3d 768, 772 (1992). On December 19, 1984, Dr. Richard McCormick performed a surgical procedure on the plaintiff called a Nissen fundoplication. *Id.*

¶ 21            On December 24, 1984, the plaintiff experienced vomiting. *Id.* at 773. On December 26, 1984, the plaintiff complained of chest pain (*id.* at 773-74), and Dr. McCormick examined the plaintiff and determined the chest pain was a normal side effect of the surgery (*Gill*, 157 Ill. 2d at 310). The next day, Dr. McCormick received another report of plaintiff's pain. *Id.* Finally, on December 28, the plaintiff again reiterated to Dr. McCormick that he continued to have chest pain. *Id.* Dr. McCormick chose not to examine the plaintiff again and discharged the plaintiff three hours later. *Id.* at 310-11.

¶ 22            After Dr. McCormick discharged the plaintiff from the hospital, the plaintiff

complained of chest pain to the discharge nurse. *Id.* at 309. "The nurse, aware that plaintiff had complained of chest pain previously, examined [the plaintiff]." *Id.* The plaintiff indicated the nurse, after listening to his chest, stated something was wrong and advised the plaintiff to go to his family doctor. *Id.*

¶ 23       The plaintiff brought a claim against the hospital, alleging the hospital breached its "standard of care by discharging plaintiff from the hospital even though plaintiff complained of chest pain, failing to inform the treating physician that plaintiff was complaining of chest pain at the time of discharge, and failing to communicate plaintiff's clinical findings to a nursing supervisor for appropriate care." *Id.* The hospital filed a motion for summary judgment denying both the negligence of its nurses and that the alleged negligence was the proximate cause of the plaintiff's injuries. *Id.* at 309-10.

¶ 24       The trial court granted the hospital's motion for summary judgment. *Id.* at 310. This court affirmed. The plaintiff appealed this court's decision to our supreme court. According to the supreme court's opinion:

> "On appeal to this court, plaintiff maintains that the omissions of the nursing staff at St. John's Hospital contributed to the delay in diagnosing the plaintiff's complications, resulting in a much more difficult and complicated operation. Plaintiff argues that the appellate court decision has the effect of requiring [the] plaintiff to prove that defendant's negligence was more likely than not the cause of plaintiff's injuries at the summary judgment stage. [The] [p]laintiff contend[ed] that it was a jury question as to whether the nurse's omission contributed to, and was thus a proximate cause of plaintiff's injuries." *Id.*

Our supreme court indicated it could not agree because a review of the evidence could only lead

to the result reached by this court. *Id.* The court explained its reasoning as follows:

> "when plaintiff was discharged from St. John's Hospital, he was experiencing pain in his chest for which he was taking no medication, which was similar to that which he had been experiencing for several days prior to discharge, and which he had reported to his attending physician on the morning of discharge. In light of these facts, we must agree with the appellate court and find that even assuming the nurse had breached a duty to inform the treating physician of the patient's complaint, this breach did not proximately cause the delay in the correct diagnosis of the plaintiff's condition." *Id.* at 311.

As noted by our supreme court, "[i]t is uncontroverted *** that the treating physician had repeated contacts with [the] plaintiff" after the plaintiff was exhibiting the symptoms he mentioned to the discharge nurse, and the treating physician "failed to properly diagnose the problem." *Id.* at 310. As a result, the discharge nurse's failure to report information the doctor was already aware of could not have been the proximate cause of any delay in the plaintiff's treatment. *Id.*

¶ 25    Unlike what happened in *Gill*, in the case *sub judice*, questions of fact exist regarding whether Drs. Crawford, Esparaz, and Sarran had a complete understanding of Stephanie's condition during the period between the completion of her surgery and Dr. Crawford's decision to discharge her.

¶ 26    We note Dr. Crawford testified in his deposition that it is important to make sure a patient's pain and nausea are controlled when determining whether discharge is appropriate. When asked how he made sure this was the case, Dr. Crawford testified he relies heavily on the nursing staff. However, he also testified he did not typically review notes made by the nursing staff that are kept in the hospital's electronic record system. According to Dr. Crawford, the electronic

record system does not make it easy to find those notes with regard to a patient's pain level, dietary information, vitals, and physical observations. As a result, Dr. Crawford testified he primarily relies on "verbal communication with those who are in direct contact with the patient." In other words, he relies on important information being relayed from the nursing staff to the resident physicians who then relay the information to him. In some cases, he indicated the nurses might bring the information to him directly. Dr. Crawford indicated it was his understanding that Dr. Esparaz's reports to him on Stephanie's condition were based in part on information being provided to Dr. Esparaz by the nursing staff with regard to her pain and nausea.

¶ 27        Dr. Crawford indicated he did not recall receiving any phone calls from any nursing staff about Stephanie after her surgery. With regard to Stephanie's pain level after the surgery, this information was not reported to him on an ongoing basis. He also indicated he did not know if this information was reported to anybody from the surgical team. He did not recall being told Stephanie last reported her pain before being discharged as 10 out of 10.

¶ 28        Later, when Dr. Crawford was being questioned by the attorney representing defendants Martin and Methodist, Dr. Crawford testified he did not recall any member of the nursing staff bringing any questions or concerns regarding Stephanie to his attention. Further, Dr. Crawford indicated he did not have any information regarding any communication that might have taken place between the nursing staff and the medical residents.

¶ 29        Dr. Esparaz, who was a resident during the period of time at issue in this case, testified he would expect to be contacted by a nurse if a patient had continuing abnormal pain. While a nurse placing this kind of information into the patient's chart would be adequate to put him on notice if he read the chart, he did not remember if he read Stephanie's chart in this case. According to Dr. Esparaz, he relied on the nursing staff and Dr. Sarran, his junior resident, for

information about Stephanie's condition between her surgery and her time of discharge. When he saw Stephanie at the time the discharge decision was made, he recalled she was doing well and indicated she wanted to go home. He said her pain was controlled. His assessment was based on his observation of Stephanie. He did not recall receiving any information about Stephanie from the nursing staff. Dr. Esparaz acknowledged it was important to take a patient's trends into consideration when making a discharge decision. He also indicated he was not aware Stephanie had been repeatedly screaming out that she wanted to go home, consistently been assessing her pain as a 10 on a 10 scale, only eaten 25% of her breakfast, and refused to eat her lunch on the day of her discharge.

¶ 30　　　　Dr. Sarran, who was also a resident at the time of the incidents in this case, testified he saw Stephanie during his rounds on the morning of January 17, 2017, at 7:23 a.m. At that time, he observed Stephanie was having some abdominal pain. The nursing staff and Stephanie's mother indicated Stephanie had suffered some dry heaving. He indicated he *likely relied* on nursing staff and Stephanie's mother for his note that Stephanie was tolerating a clear liquid diet. He did not recall whether he was aware that Stephanie had been given any opioid painkillers and antinausea agents throughout the night. According to Dr. Sarran, it would have been the job of the nursing staff to report changes in Stephanie's pain level to him, and he would have relied on Martin to convey to him whether Stephanie was not responding adequately to her pain medication. Sarran testified he did not recall whether Martin reported to him that Stephanie had been given a double dose of morphine at 4:34 a.m. on January 17 and she was not responding to a single dose. He also did not recall Martin reporting to him Stephanie had been given a third dose of morphine at 6:31 a.m. Dr. Sarran acknowledged a dose of morphine should be effective for six hours, which meant Stephanie was complaining of abdominal pain when she should have been feeling the effects of

three doses of morphine when he saw her at 7:23 a.m. on January 17. In addition, Dr. Sarran testified his medical note indicated he did not believe Stephanie was ready for discharge at 7:24 a.m. because her pain needed to be controlled and he wanted to see how she did on a "full-liquid diet, graduated liquid diet." Dr. Sarran testified his note indicated a reasonable time to reconsider Stephanie's discharge would be between 7:30 p.m. on January 17 and 7:30 p.m. on January 18. When asked if he had an opinion on what he expected nurses to communicate to him, Dr. Sarran responded:

> "Yes. I would just say that I expect the nurses to communicate to me, certainly, any patient that's in distress, any patient that's at risk of decompensation or deterioration, and anybody that—any patient that is—whose needs are—or needs or complaints are outside the limits of our normal postoperative encounters, and certainly, above or beyond the ordered medications and interventions."

He was also asked what he recalled about the encounter with Stephanie and Dr. Crawford on the afternoon of January 17. He responded:

> "I recall that Dr. Crawford sat with Stephanie and her mother for an extended period of time, longer than is normal for—or longer than is, I guess, expected in this setting. I'm sorry, I shouldn't—not expected, longer than what is standard, I suppose—to discuss any—the concerns that—any concerns that her mother had. I recall that she was anxious about discharge, but that at the end of the conversation, we had met and answered all of their concerns."

He did not recall what Stephanie's mother's specific concerns were. However, he indicated at the end of the conversation everyone, including Stephanie's mother, felt that it was appropriate for Stephanie to go home at that time.

¶ 31 On redirect examination from plaintiffs' counsel, Dr. Sarran indicated he had no specific recollection Stephanie only had 480 milliliters of fluid intake, only ingested 25% of her breakfast, had ingested none of her lunch, or that at the time of discharge Stephanie was reporting her pain as a 10 on a 10 scale. Dr. Sarran indicated Stephanie's pain level was something he would have liked to have known.

¶ 32 Finally, Martin testified in her deposition she would document any communication she had with the surgical team. She also indicated she would expect the surgical team to rely upon her analysis of the details of a patient's condition when considering whether to discharge the patient. According to Martin, when Stephanie came into her care at 7 a.m., she had been reporting her pain as a 10 on a 10 scale all night. During Martin's shift on January 17, 2017, Stephanie consumed 25% of her breakfast and none of her lunch. Martin testified that around 7:27 a.m., she documented Stephanie's self-reported pain level was a 10 on a 10 scale. Stephanie was crying out in pain at that time, including hollering she wanted to go home. She was also anxious, and her facial expressions indicated she was not happy. Martin indicated efforts were made to console her.

¶ 33 According to Martin, Stephanie was given Hycet around 7:30 a.m. By 8:30 a.m., Stephanie was reporting her pain to be an 8 out of 10 due to the Hycet. However, by 9:18 a.m., Stephanie was reporting her pain was back at a 10 on a 10 scale. Her pain was never charted again before she was discharged. Martin indicated Stephanie must have still been complaining of pain at 12:47 p.m. because Martin gave her Hycet again. Martin did not recall seeing or talking to Dr. Crawford about Stephanie's condition on January 17, 2017. She also did not recall talking to the surgical residents about Stephanie's condition.

¶ 34 When the evidence in this case is viewed in a light most favorable to plaintiffs, it is not clear Drs. Crawford, Esparaz, or Sarran were ever fully aware of Stephanie's condition.

Because it was difficult for the doctors to acquire all of a patient's relevant information from the electronic records system, Dr. Crawford and the residents relied on the nurses to personally deliver to them important information about a patient's condition, even though the nurses may have already entered the same information into the electronic record keeping system.

¶ 35       As a result, while the doctors certainly made observations and conclusions with regard to Stephanie's condition while they were in direct contact with her, it is not clear from the record that they had all the relevant information with regard to Stephanie's condition necessary to fully evaluate her situation. For example, the record does not establish that any of the doctors were aware during their direct observation of Stephanie that she had been administered pain medication shortly before they evaluated her condition. In addition, the record also does not establish the doctors were aware Stephanie had been crying out that she wanted to go home while she was in severe pain earlier that morning.

¶ 36       Stephanie had repeatedly self-reported her pain as a 10 on a 10 scale, had repeatedly cried out that she wanted to go home while complaining of severe pain, and had been administered multiple doses of morphine when she was seen by the medical residents when they assessed her on the morning of January 17. Stephanie was still being given Hycet for her pain that morning—which seemed to provide some temporary pain relief to Stephanie who would soon self-report her pain back at a 10 on a 10 scale. When the evidence in this case is viewed in a light most favorable to plaintiffs for purposes of summary judgment, Drs. Crawford, Esparaz, and Sarran were not aware when they determined Stephanie could be discharged that she (1) was given Hycet before they met with her, (2) had complained of 10 out of 10 pain with periods of short term relief after taking pain medicine that morning, (3) had cried out that she wanted to go home that morning while also rating her pain as a 10 on a 10 scale, (4) had been intaking progressively smaller

- 15 -

amounts of her meals up to the point where she had only 25% of her breakfast and none of her lunch the day they discharged her, and (5) had experienced dry heaving.

¶ 37　　　　This is not a situation like *Gill* where the plaintiff had been making the same consistent complaints of chest pain, was not taking any medication for the chest pain, and Dr. McCormick was aware of the plaintiff's chest pain. In this case, Stephanie's pain complaints were fluctuating, and she was on multiple doses of painkillers. While Drs. Crawford, Esparaz, and Sarran believed they were able to judge Stephanie's pain level and condition during their direct observations, the evidence is not clear they were aware of Stephanie's fluctuating conditions or the amount of pain medicine she was on during their direct observations. As a result, the trial court erred in granting Martin and Methodist's motion for summary judgment based on *Gill*.

¶ 38　　　　　　　　　　　C. Proximate Cause Evidence

¶ 39　　　　Although not relied upon by the trial court, Martin and Methodist argue this court can affirm the trial court's summary judgment order on other grounds. According to Martin and Methodist, even if Martin had not reported Stephanie's condition to Drs. Crawford, Esparaz, or Sarran and questions of fact exist regarding what the physicians knew about Stephanie's condition, plaintiffs' evidence is still insufficient to sustain the proximate cause element of their malpractice claim against Martin and Methodist.

¶ 40　　　　They contend plaintiffs have no evidence Dr. Crawford would have acted differently if he had complete knowledge of Stephanie's condition during the period between the completion of her surgery and his final assessment of her on January 17 when he made the discharge decision. According to their brief, nurse Martin's failure to verbally advise Dr. Crawford of this information cannot be the proximate cause of his decision to discharge her because he testified he had all the information he needed to make the discharge decision. We first note this is

a conclusory statement by Dr. Crawford.

¶ 41      It does not appear he ever specifically indicated his discharge decision would have been the same if he had known the following: Stephanie had been self-reporting pain of 10 on a 10 scale throughout the night and morning; she suffered from anxiety that morning and appeared unhappy; she cried out and hollered that she wanted to go home and had to be consoled by the nursing staff; she received only short term relief from the pain medicine she was being given; she complained of abdominal pain to Dr. Sarran on the morning of January 17, even though she had three active doses of morphine in her system; she had been given Hycet shortly before Drs. Crawford, Esparaz, and Sarran met with her and made the discharge decision; her liquid diet meal intake had dropped from 50% on January 16, to 25% at breakfast on January 17, to her refusing her lunch on January 17; she experienced dry heaving; and Dr. Esparaz and Dr. Sarran, who Crawford was relying on for information and assessment of Stephanie's condition, also were unaware of this information.

¶ 42      Regardless, even assuming, *arguendo*, Dr. Crawford would have testified his discharge decision would have been the same had he known all this information, this would not automatically entitle Martin and Methodist to summary judgment. According to our supreme court, when a physician testifies he would not have acted differently regardless of the fact he did not have certain information, a plaintiff is

> "free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decisionmaking." *Snelson v. Kamm*, 204 Ill. 2d 1, 45-46 (2003).

If a plaintiff presents such expert testimony, "a factual dispute as to proximate cause would be created sufficient for the jury to resolve." *Id.*

¶ 43   One of plaintiffs' experts in this case, Dr. Allen, testified it was his opinion Stephanie suffered an intra-abdominal rupture of the fundus of the stomach sometime after her surgery but before she was discharged from the hospital. He based this diagnosis on the following: she initially did well after the surgery; she then developed dry-heaves; she was not tolerating her meals; she complained her pain was a 10 on a 10 scale; and she became tachycardic. Allen testified these are all signs of intra-abdominal complications. Allen was critical of the fact no labs or X-rays were done on Stephanie while she was doing poorly. With regard to the nursing staff at the hospital, which included Martin, Allen testified they failed to convey Stephanie's condition to Dr. Crawford. According to Allen's testimony, if a patient like Stephanie has bad pain, is unable to eat, and has tachycardia, the standard of care would require the patient be kept overnight, additional lab work done, and possibly additional procedures be performed, such as a gastrograph and swallow X-ray. Allen stated if Stephanie had been kept overnight at the hospital, the changes in her pain level could have been monitored by medical professionals rather than by Stephanie's mother, who Dr. Crawford testified had issues.

¶ 44                              D. Rule 213 Witness Disclosure

¶ 45   Next, defendants Martin and Methodist argue plaintiffs should not be able to rely on any opinion by Dr. Allen that a violation of the standard of care by Martin was a proximate cause of Stephanie's premature discharge from the hospital because plaintiffs' amended witness disclosure pursuant to Rule 213 did not indicate Allen would be offering this opinion. We disagree.

¶ 46   As plaintiffs point out in their reply brief, Rule 213(g) states:

"*(g) Limitation on Testimony and Freedom to Cross-Examine.* The

- 18 -

information disclosed in answer to a Rule 213(f) interrogatory, *or in a discovery deposition*, limits the testimony that can be given by a witness on direct examination at trial. *Information disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition.* Except upon a showing of good cause, information in an evidence deposition not previously disclosed in a Rule 213(f) interrogatory answer or in a discovery deposition shall not be admissible upon objection at trial.

Without making disclosure under this rule, however, a cross-examining party can elicit information, including opinions, from the witness. This freedom to cross-examine is subject to a restriction that applies in actions that involve multiple parties and multiple representation. In such actions, the cross-examining party may not elicit undisclosed information, including opinions, from the witness on an issue on which its position is aligned with that of the party doing the direct examination." (Emphases added.) Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018).

Dr. Allen's opinions were given during what appears to be a discovery deposition.

¶ 47                    E. Summary Judgment Ruling is Reversed

¶ 48        Considering the trial court and this court are required to construe both the pleadings and the evidentiary material in the record strictly against defendants Martin and Methodist as they moved for summary judgment (*Buck*, 2013 IL App (1st) 122144, ¶ 56) and also the drastic nature of granting a motion for summary judgment (*Bagent*, 224 Ill. 2d at 163), we hold the trial court erred in granting Martin and Methodist's motion for summary judgment. Genuine issues of

material fact exist in this case regarding the relevant issues.

¶ 49                                III. CONCLUSION

¶ 50            For the reasons stated, we reverse the trial court's order granting defendants Martin

and Methodists' motion for summary judgment and remand this case for further proceedings.

¶ 51            Reversed and remanded.

*Belknap v. Crawford*, 2024 IL App (4th) 230679

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 18-L-104; the Hon. Frank W. Ierulli, Judge, presiding. |
| **Attorneys for Appellant:** | David R. Nordwall, of Law Office of David R. Nordwall LLC, of Chicago, M. Tod Melton, of Melton Law Firm, LLC, of Rock Falls, for appellants. |
| **Attorneys for Appellee:** | Christopher J. Drinkwine, of Heyl, Royster, Voelker & Allen, P.C., of Rockford, for appellees. |